**2020 IL 124046**

# IN THE

# SUPREME COURT

# OF

# THE STATE OF ILLINOIS

_____

(Docket No. 124046)

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v.
ASHANTI LUSBY, Appellee.

_Opinion filed October 22, 2020.—Rehearing denied February 26, 2021._

JUSTICE THEIS delivered the judgment of the court, with opinion.

Chief Justice Anne M. Burke and Justices Kilbride, Garman, Karmeier, and Michael J. Burke concurred in the judgment and opinion.

Justice Neville dissented, with opinion, and dissented upon denial of rehearing, with opinion.

**OPINION**

¶ 1    In 2002, defendant Ashanti Lusby was convicted of first degree murder, aggravated criminal sexual assault, and home invasion and sentenced to 130 years' imprisonment. Though he was 23 years old at the time of the trial and the sentencing

hearing, he was only 16 years old at the time of the offenses. After unsuccessful direct appeal and postconviction proceedings, he filed a motion for leave to file a successive postconviction petition, asserting that his sentencing hearing was constitutionally inadequate under *Miller v. Alabama*, 567 U.S. 460 (2012). The circuit court of Will County denied that motion, but the appellate court reversed and remanded for a new sentencing hearing. For the reasons that follow, we reverse the appellate court's decision and affirm the trial court's decision.

¶ 2                                            BACKGROUND

¶ 3        In 1993, Jennifer Happ moved to Joliet to teach third grade at a public elementary school. A year later, she purchased a condominium on the city's west side, where she lived until 1996.

¶ 4        Just before 9 p.m. on February 8, 1996, Happ spoke on the telephone with her coworker and friend, Kelly Nesheim, about a trip together to Iowa over the following weekend. Around 9:30 p.m. Happ's neighbors heard a gunshot from her home. One of the neighbors telephoned Happ, but she did not answer. After Happ did not arrive at school the next day, her teaching partner and friend, Trudy Bajt, asked her husband Steve Bajt, a Joliet Police Department detective, to visit Happ's condominium to check on her. When Detective Bajt arrived at the condominium, the exterior and interior garage doors were open. Inside, a kitchen drawer was open, and the bedroom dresser was ransacked. Detective Bajt called the dispatcher and requested backup. He then reentered the condominium and found Happ lying dead on her couch. A subsequent medical examination revealed that she had been superficially incised across her neck and sexually assaulted while alive. She died from a hard-contact, execution-type gunshot wound to her forehead. Although police found fresh footprints in the mud outside Happ's condominium leading toward nearby apartments, their investigation failed to identify the killer.

¶ 5        Five years later, the case broke. In early 2001, DeWayne Williams sent a letter to the Joliet Police Department that recounted a conversation that he and the defendant had at the Will County jail in 1996 regarding Happ's murder. Detectives interrogated the defendant. When they informed him that the investigation linked him to Happ's murder, he responded "oh shit" but denied any knowledge of the crime. The police obtained a search warrant to secure blood and saliva from the

defendant. A forensic scientist with the Illinois State Police laboratory determined that bloodstains on a knife found near the couch in Happ's condominium matched her genetic profile. Another forensic scientist with the state laboratory found one female and one male genetic profile in both the vaginal and rectal swabs taken from Happ's body during her autopsy. The female profile obviously matched Happ; the male profile matched the defendant. He was charged in a 15-count indictment with first degree murder, aggravated criminal sexual assault, and home invasion.

¶ 6        At trial, Darylyn Phillips, the defendant's girlfriend in 1996, testified for the State. Phillips stated that, on a night in early February of that year, her father drove her to an apartment where the defendant lived with his mother and two sisters. The defendant and two friends, Williams and Fabian Carpenter, were watching a pornographic movie in the living room. Phillips spoke with one of the defendant's sisters until the movie ended. At that time, the defendant went to his bedroom and emerged with a revolver, which he stuck into the front of his pants. He then left the apartment with Williams and Carpenter for 30 to 45 minutes. The three of them returned to the apartment, running up the stairs around 10 p.m. According to Phillips, "They just looked kind of excited a little bit." She had never seen the defendant like that, explaining that "[h]e was just different" and "[a] little nervous maybe." The defendant, Williams, and Carpenter went to the defendant's bedroom and closed the door. Phillips asked them what they were doing, and they responded, "Nothing." She left shortly thereafter.

¶ 7        The defendant testified on his own behalf. He stated that on February 8, 1996, around 5:30 p.m., he was walking home from a friend's house, when he heard a man and a woman, whom he later identified as Happ, yelling from her condominium. He never saw the man, but he saw Happ standing in the front door wearing a T-shirt and apparently nothing else. The defendant stated that she asked him what he was looking at, and he answered that he was looking at her. She asked him his age, and he answered 18. Happ purportedly invited the defendant inside. She offered him a drink, but he refused. They sat on the couch together, and Happ swung her legs up and onto the defendant's lap. He then realized that she was wearing underwear. The defendant stated that he watched television and she read a book for 10 to 15 minutes, after which she initiated physical contact.

¶ 8        The defendant described a short period of consensual vaginal intercourse and inadvertent anal intercourse. According to the defendant, Happ said "oh when it went in the other place." She pushed him away, stood and walked to the front door, opened it, and said "sorry, it's a mistake, it's been a mistake." When she told him to leave, he did. The defendant testified that he was inside the condominium for 30 minutes and that he did not have a gun or touch a knife there. Happ was alive when he departed. He had never seen her before and never saw her after. He returned home, where he and Phillips argued for an hour.

¶ 9        On cross-examination by the State, the defendant stated he was "shocked by the whole incident" with Happ, though he was "pretty experienced in sex" at age 16. He explained that he lied about his age to Happ "to try to get at her." His aim was to have a relationship with her "whatever day it comes up"—"maybe not then, but in the near future." Once inside the condominium, the defendant and Happ did not converse. He estimated that they had intercourse at "6:30, almost 7:00, something like that maybe" and that when he left "[i]t couldn't have been over 7:00." He stated that he departed Joliet a few days later and stayed with his uncle in Chicago until April because he was "involved in a shooting" unrelated to Happ's murder and did not want to go to jail. The defendant denied any knowledge of Happ's murder until he spoke to police in 2001.

¶ 10       A jury convicted the defendant on all 15 counts, but those convictions were reduced to three: first degree murder, aggravated sexual assault, and home invasion. Because he was 16 years old at the time of the murder, he was not eligible for the death penalty, but the State sought an extended term of 60 to 100 years because the crime showed brutal and heinous behavior indicative of wanton cruelty. See 730 ILCS 5/5-8-1(a)(3) (West 2002). The defendant also faced terms of 6 to 30 years for aggravated criminal sexual assault and 6 to 30 years for home invasion. The statutory scheme mandated consecutive sentences, but the aggregate sentence could not exceed the maximum for the two most serious offenses. See *id.* § 5-8-4(a), (c)(2). The defendant's maximum sentence, therefore, was 130 years.

¶ 11       A Will County probation officer and a probation supervisor together prepared a presentence investigation (PSI) report. The report spanned 11 pages, 3½ of which summarized the charges against the defendant and the remainder of which detailed his background. The defendant was born in Chicago in 1979 and moved to Joliet at

age 10. He moved back to Chicago for a year at age 14 and returned to Joliet afterwards. The report referred to another PSI report completed in 1999, which indicated that the defendant was expelled from a Chicago high school after tenth grade for "gang banging." He received his general equivalency diploma (GED) while incarcerated in the Illinois Youth Center. The defendant had a history of alcohol, marijuana, and PCP use. He denied any current alcohol or drug use and claimed that he had completed drug treatment. According to the report, the defendant had no past or present mental health treatment or institutionalization.

¶ 12    The report stated that "the defendant reportedly enjoys spending time with his children and family." The defendant added that he had a good relationship with his parents and that they visited him often in jail, though the officials found no record that the defendant's father had been there. The defendant had two sisters and two young daughters.

¶ 13    The defendant's criminal history was extensive. In 1996, he was adjudicated delinquent for aggravated discharge of a firearm, incarcerated for nearly 16 months, and released on parole. The report noted that he was discharged from parole on April 14, 1998, and arrested on that date for robbery. In 1999, he was convicted of robbery and sentenced to 48 months' probation. And in 2001, he was charged with resisting a police officer and given a $250 fine and then charged with aggravated battery. At the time of the report, that charge was still pending. The probation officials concluded the report with this comment:

> "Presenting before the Court is a 23-year-old male convicted of several counts of First Degree Murder, Aggravated Criminal Sexual Assault and Home Invasion. He has several violent offense convictions, no employment history and an admitted substance abuse history. The defendant may benefit from counseling to control his violent tendencies."

The State attached 21 victim impact statements as an addendum to the report.

¶ 14    At the beginning of the sentencing hearing, the trial judge stated that he had reviewed the PSI report and asked if the parties had done so. In response to defense counsel's objection to the prejudicial number of letters, the trial court stated, "I will base the decision on the facts of the case and not on these letters." The State supplemented the report with a 1999 attempted obstruction of justice conviction

where the defendant used the alias Dale Williams. Defense counsel accepted the State's representations.

¶ 15    Two witnesses testified for the State at the sentencing hearing. Robert Miller stated that he was an inmate at the Will County jail with the defendant, who was awaiting trial in this case. The defendant erroneously accused Miller of "cutting" in line for the telephone and summoned him into the gym. When Miller got there, the defendant attacked him. Miller suffered a broken nose and a broken orbital bone, and he required stitches in his lip. Jean Happ, the victim's mother, also testified, reading her impact statement. The defendant did not present any witnesses or offer any evidence at the hearing.

¶ 16    In recommending a sentence, the State asked the court to "look at the background of this individual for a minute through the PSI," which included the defendant's criminal history. The State alluded to the defendant's age and rehabilitative potential:

"[A]t 16 years old this particular defendant has shown us what he can do at a young age. And as you begin to consider what to do in sentencing, you've got to consider what this guy can do the older he gets and what he might do in the latter part of his life because if the younger part of his life is an indication of what this guy's potential is, this is a dangerous individual and he will continue to be dangerous well into his senior citizen years.

* * *

    *** From the acts in this case itself, from the cut mark to the throat, to the rape, to the murder, to the testimony, to the custody, to the background that this guy has, there is nothing here, Judge, in mitigation. That's because he just doesn't have it in him."

The State urged the court to impose a sentence to ensure that the defendant would never again be released.

¶ 17    Defense counsel simply urged the court to consider the defendant's age, stating:

"Certainly you have to take into consideration what occurred, the nature of Miss Happ's death. I understand that you also have to take into consideration my

client's age. We know that nobody is the same person forever. We learn that through our own experiences. We know good or bad sometimes it goes one way, sometimes it goes the other, but I don't know any of us are the same person at 17 and then at 27 and then at 37, 47 or whatever. I just ask you to exercise reason, your conscience, your experience in setting an appropriate sentence, Judge."

In allocution, the defendant expressed remorse that Happ had died but continued to maintain his innocence, repeating that she was alive when he left the condominium. Regarding his altercation with Miller, the defendant explained, "I fight, we have problems." He admitted that he has "been a little rough around the edges." He insisted, however, that he was not a killer or a rapist, adding that, in the five years between her death and his arrest, he was never accused of killing or raping anyone else.

¶ 18    The trial court then stated:

"[T]his is a case that is a very difficult case from the standpoint of the facts of the injuries and of the method of murder of the victim. It certain—certainly the defendant's age is a factor at the very least to the extent that he is not eligible for the imposition of capital punishment based solely because of his age, because but for his age at under the age of 18, certainly this—these are the type of things, let me put it that way, that I have seen that all the attorneys that are in this trial have seen as facts that would—that could be considered capital punishment activities.

But I cannot, I cannot ignore the fact that Miss Happ was terrorized and sexually assaulted and humiliated and executed in her own home, and this was clearly a depraved act by you, Mr. Lusby, and it shows absolutely no respect for human life. It is ironic to me I guess that this Miss Happ was working to provide a positive influence on children in the area and the area that you lived in and even children that were—would be yours or your nieces or nephews or other family members might have been influenced positively by this woman, but your actions saw that didn't happen.

So it is very difficult for me to consider any leniency in this case. It is very difficult for me to see any factors in mitigation. I have gone through the section on mitigation. There are no factors in mitigation that apply.

I have gone through the factors in aggravation and those factors there are many that apply, and I sincerely believe that the appropriate sentence is a sentence that will see that this does not occur outside of the Department of Corrections again. This is a choice that you made at a young age and I know that choices, youthful choices can be—are not, you know, sometimes are [*sic*] sometimes in very very poor judgment, but this is not one that can be taken back, and this is not one that can be considered minor, and this is not one that can be considered for anything but setting your future in the Department of Corrections.

From what I've seen here from everything that I have seen and heard in this trial this is a life you chose, a life of carrying weapons, a life of showing no respect for human life, and I am not at all uncomfortable in imposing the maximum sentence on the murder of 100 years. The consecutive sentence on the other two Class X offenses again the manner and method of this crime makes me convinced that it is not for me to minimize it in any way, and as a consequence I will impose an additional consecutive 30 years on each of these offenses. So that is the order of the Court."

Thus, the court sentenced the defendant to 100 years' imprisonment on the first degree murder conviction, followed by concurrent 30-year sentences for aggravated criminal sexual assault and home invasion, totaling 130 years' imprisonment.

¶ 19 The defendant filed a motion to reconsider, arguing that the trial court failed to consider his age and his potential for rehabilitation. Specifically, the defendant insisted that the court failed "to adequately consider the fact that [he] was a minor at the time of the offenses" and further "fail[ed] to adequately consider his potential for rehabilitation and return to useful citizenship" if provided "appropriate counseling and direction." The trial court denied the motion, stating:

"I [think] these motions are required prior to a thorough appellate review. It's always difficult for the Trial Judge because you prepare yourself for sentencing like this, you sit down and you look at everything. You look at the

law and look at the sentencing Code, because it's confusing, and you try to fashion the sentence appropriate and consisten[t] with the sentencing Code and appropriate to the facts. I believe I felt comfortable with my sentence at the time. I believe I followed the law as I understood it and took into account all the factors both in aggravation and in mitigation that apply here. So show the motion to reconsider sentence presented and argued and denied."

¶ 20      The defendant appealed, arguing that the State committed reversible error in impeaching him with his post-*Miranda* silence and his refusal to provide a blood sample for which a warrant had not been issued and that the plain error doctrine excused his failure to object at trial. See *Miranda v. Arizona*, 384 U.S. 436 (1966). The appellate court found that the evidence against the defendant was not closely balanced and affirmed his convictions and sentences. *People v. Lusby*, 353 Ill. App. 3d 1109 (2004) (table) (unpublished order under Illinois Supreme Court Rule 23). This court denied the defendant's petition for leave to appeal. *People v. Lusby*, 214 Ill. 2d 544 (2005) (table).

¶ 21      In 2005, the defendant filed a *pro se* postconviction petition. He claimed that he was denied due process when he was required to wear a stun belt in the presence of the jury and that he was denied effective assistance of counsel because his attorney did not object to the use of the belt. The trial court dismissed the defendant's petition, and the appellate court affirmed that decision. *People v. Lusby*, 377 Ill. App. 3d 1156 (2007) (table) (unpublished order under Illinois Supreme Court Rule 23). This court denied the defendant's petition for leave to appeal. *People v. Lusby*, 233 Ill. 2d 582 (2009) (table).

¶ 22      In 2014, the defendant filed a *pro se* motion for leave to file a successive postconviction petition, arguing that his *de facto* life sentence violated the eighth amendment under *Miller*. See U.S. Const., amend. VIII. The State filed an objection to the defendant's motion, contending that *Miller* did not apply to this case because *Miller* addressed mandatory life sentences, not *de facto* life sentences. Further, the State noted that *People v. Davis*, 2014 IL 115595, held that *Miller* does not apply to a discretionary life sentence. In January 2015, the trial court denied the defendant's motion. He appealed.

¶ 23      A divided appellate court panel reversed the trial court's decision. 2018 IL App (3d) 150189. Relying on *People v. Holman*, 2017 IL 120655, the appellate court

majority held that *Miller* applies to discretionary life sentences, including the defendant's *de facto* life sentence. 2018 IL App (3d) 150189, ¶¶ 20-21. The majority then examined whether the defendant met the cause-and-prejudice test for filing a successive postconviction petition. The majority held that the defendant satisfied the cause prong because *Miller* was not decided until seven years after he filed his initial postconviction petition. *Id.* ¶ 23 (citing *Davis*, 2014 IL 115595, ¶ 42). The majority further held that the defendant satisfied the prejudice prong because the trial court "did not address [his] age-related characteristics" and only "gave a generalized statement about youth and their poor judgment." *Id.* ¶¶ 27-28. Additionally, though the trial court stated that there were no factors in mitigation, the court did not explicitly state that it considered the evidence in the PSI report. *Id.* ¶ 28. Because the defendant's sentence violated the eighth amendment under *Miller*, the appellate court majority remanded for a new sentencing hearing. *Id.* ¶ 29. In closing, the majority noted that the trial court erred in allowing the State to file an objection to the defendant's motion for leave to file a successive postconviction petition. *Id.* ¶ 33.

¶ 24    Presiding Justice Carter dissented. He believed that the defendant failed to establish prejudice under the cause-and-prejudice test because the trial court's comments demonstrated that it considered defendant's youth and its attendant characteristics at the sentencing hearing and again at the hearing on the defendant's motion to reconsider. *Id.* ¶ 40 (Carter, P.J., dissenting).

¶ 25    This court allowed the State's petition for leave to appeal. See Ill. S. Ct. R. 315(a) (eff. July 1, 2018). We also allowed the Children and Family Justice Center and the Juvenile Law Center to file an *amicus curiae* brief in support of the defendant's position. See Ill. S. Ct. R. 345(a) (eff. Sept. 20, 2010).

¶ 26                                ANALYSIS

¶ 27    Under the Post-Conviction Hearing Act (Act), a criminal defendant may assert that "in the proceedings which resulted in his or her conviction there was a substantial denial of his or her rights under the Constitution of the United States or of the State of Illinois or both." 725 ILCS 5/122-1(a)(1) (West 2014). The Act itself contemplates the filing of a single petition: "Any claim of substantial denial of constitutional rights not raised in the original or an amended petition is waived."

*Id.* § 122-3; see *People v. Daniel*, 379 Ill. App. 3d 748, 749 (2008) (noting that waiver in the context of postconviction petitions is "better referred to as 'forfeiture' "). Accordingly, a defendant must obtain leave of court to file a successive petition. 725 ILCS 5/122-1(f) (West 2014) ("Only one petition may be filed by a petitioner under this Article without leave of the court."). To do so, a defendant must demonstrate cause for the failure to raise the claim in the initial petition and prejudice from that failure. *Id.* Section 122-1(f) of the Act explains that a defendant shows "cause by identifying an objective factor that impeded his or her ability to raise a specific claim during his or her initial post-conviction proceedings" and "prejudice by demonstrating that the claim not raised during his or her initial post-conviction proceedings so infected the trial that the resulting conviction or sentence violated due process." *Id.*; see *People v. Pitsonbarger*, 205 Ill. 2d 444, 462 (2002). A defendant's motion for leave of court to file a successive postconviction petition should be denied when the defendant's claims fail as a matter of law. See *People v. Smith*, 2014 IL 115946, ¶ 35. Our review of such a decision is *de novo*. *People v. Bailey*, 2017 IL 121450, ¶ 13.

¶ 28     Initially, the State argues that the appellate court erred in considering whether the defendant showed cause and prejudice, rather than remanding the case so the trial court could decide that issue without input from the State. Relying on *People v. Munson*, 2018 IL App (3d) 150544, *People v. Baller*, 2018 IL App (3d) 160165, and *People v. Partida*, 2018 IL App (3d) 160581, the State asks us to hold that the appellate court must reverse and remand for further leave-to-file proceedings when the trial court commits a "*Bailey* error."

¶ 29     In *Bailey*, 2017 IL 121450, ¶ 24, we noted that under section 122-1(f) the trial court must conduct a preliminary and independent screening of the defendant's motion for leave to file a successive postconviction petition for facts demonstrating cause and prejudice. The trial court is capable of determining whether the motion made a *prima facie* showing, so there is "no reason for the State to be involved." *Id.* ¶ 25. Accordingly, we held that "the State should not be permitted to participate at the cause and prejudice stage of successive postconviction proceedings." *Id.* ¶ 24. As we did in *Bailey*, we choose to reach the merits of the defendant's motion "[i]n

the interest of judicial economy." *Id.* ¶ 42.[1] The State helped to create the error of which it complains, and it should not benefit from that by forcing the defendant to restart the process of adjudicating his *Miller* claim. See *Holman*, 2017 IL 120655, ¶ 32. Going forward, we advise the State to refrain from inserting itself into proceedings where we have clearly stated that it has no role. We now turn to the central issue of this case—whether the defendant has shown cause and prejudice such that the trial court should have granted leave to file a successive postconviction petition.

¶ 30        The State concedes that the defendant's pleadings made a *prima facie* showing of cause. See *Davis*, 2104 IL 115595, ¶ 42 ("*Miller*'s new substantive rule constitutes 'cause' because it was not available earlier to counsel"). Regarding prejudice, the State argues that the defendant's sentencing hearing complied with *Miller*. According to the State, *Miller* does not require a trial court to use "magic words" before sentencing a juvenile defendant to life imprisonment. Rather, *Miller* only requires a trial court to consider "youth-related factors." The State insists that the trial court considered those factors in this case.

¶ 31        The defendant disagrees. Echoing the appellate court majority, the defendant asserts that the trial court made only a generalized statement about the poor judgment of adolescents. The defendant acknowledges that the court referred to his age in noting his ineligibility for the death penalty, but he insists that the court considered "almost no information" about him "as a unique, individual human being with unique, individual thoughts and feelings." Instead, the court focused on Happ and the circumstances of her death. Relying on *Miller*, the defendant contends that "even a horrific offense says nothing about the offender's capacity—or lack of capacity—for rehabilitation." While no "magic words" are required, the trial court must consider the defendant's youth and its attendant circumstances in mitigation. The defendant argues that the trial court did not do so.

¶ 32        The relevant legal principles are familiar. The United States Constitution prohibits "cruel and unusual punishments." U.S. Const., amend. VIII. That

---

[1]The appellate court is not foreclosed from adopting that approach. *Munson*, *Baller*, and *Partida* incorrectly held the only remedy for a *Bailey* error is a remand. See *People v. Conway*, 2019 IL App (2d) 170196, ¶ 23 ("*Bailey* *** indicates that, at least in some cases, considerations of judicial economy militate against remand to the trial court"); accord *People v. Dolis*, 2020 IL App (1st) 180267; *People v. Coffey*, 2020 IL App (3d) 160427; *People v. Ames*, 2019 IL App (4th) 170569.

prohibition includes not only inherently barbaric penalties but also disproportionate ones. *Graham v. Florida*, 560 U.S. 48, 59 (2010). Under the eighth amendment, sentences must be "graduated and proportioned" to the offender and the offense. *Davis*, 2014 IL 115595, ¶ 18 (citing *Roper v. Simmons*, 543 U.S. 551, 560 (2005)). "When the offender is a juvenile and the offense is serious, there is a genuine risk of disproportionate punishment." *Holman*, 2017 IL 120655, ¶ 33. Consequently, the United States Supreme Court has advised that "children are constitutionally different from adults for purposes of sentencing." *Miller*, 567 U.S. at 471. The Court outlawed capital sentences for juveniles who commit murder in *Roper* and capital sentences for juveniles who commit nonhomicide offenses in *Graham*. And in *Miller*, the Court barred mandatory life sentences for juveniles who commit murder.

¶ 33    The constitutional flaw with mandatory life sentences is their mandatoriness. "By removing youth from the balance," statutes imposing such sentences prohibit a trial court from "assessing whether the law's harshest term of imprisonment proportionately punishes a juvenile offender." *Id.* at 474. A court "misses too much" if it cannot consider the hallmark features of youth. *Id.* at 477. Stated differently, a court does not miss too much if it can and does consider those features. See *id.* at 489 (stating that a sentencer "must have the opportunity to consider mitigating circumstances before imposing the harshest possible penalty for juveniles"). Thus, *Miller* did not foreclose the possibility of discretionary life sentences for juveniles. Instead, the Court mandated a "certain process— considering an offender's youth and attendant characteristics" before a trial court may impose such a sentence. *Id.* at 483. As the Court restated in *Montgomery v. Louisiana*, 577 U.S. ___, ___, 136 S. Ct. 718, 735 (2016), "A hearing where 'youth and its attendant characteristics' are considered as sentencing factors is necessary to separate those juveniles who may be sentenced to life without parole from those who may not" (quoting *Miller*, 567 U.S. at 465).[2]

---

[2]The parties agree that there are no "magic words." Indeed, the Court has observed that "*Miller* did not require trial courts to make a finding of fact regarding a child's incorrigibility." *Montgomery*, 577 U.S. at ___, 136 S. Ct. at 735. On March 9, 2020, the United States Supreme Court granted a *certiorari* petition in Jones v. Mississippi, No. 18-1259, to decide "[w]hether the Eighth Amendment requires the sentencing authority to make a finding that a juvenile is permanently incorrigible before imposing a sentence of life without parole." Question Presented, Jones v. Mississippi, No. 18-1259

¶ 34    The *Montgomery* Court did not specify which characteristics attend youth, but this court did so in *Holman*. There, we explained the connection between those characteristics—the so-called *Miller* factors—and incorrigibility:

> "Under *Miller* and *Montgomery*, a juvenile defendant may be sentenced to life imprisonment without parole, but only if the trial court determines that the defendant's conduct showed irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation. The court may make that decision only after considering the defendant's youth and its attendant characteristics. Those characteristics include, but are not limited to, the following factors: (1) the juvenile defendant's chronological age at the time of the offense and any evidence of his particular immaturity, impetuosity, and failure to appreciate risks and consequences; (2) the juvenile defendant's family and home environment; (3) the juvenile defendant's degree of participation in the homicide and any evidence of familial or peer pressures that may have affected him; (4) the juvenile defendant's incompetence, including his inability to deal with police officers or prosecutors and his incapacity to assist his own attorneys; and (5) the juvenile defendant's prospects for rehabilitation." *Holman*, 2017 IL 120655, ¶ 46.

See also *People v. Reyes*, 2016 IL 119271, ¶ 9 (*per curiam*) (stating that a juvenile defendant may not receive a *de facto* life sentence "without first considering in mitigation his youth, immaturity, and potential for rehabilitation"); *People v. Buffer*, 2019 IL 122327, ¶ 27 (stating that, to prevail on a *Miller* claim, "a defendant sentenced for an offense committed while a juvenile must show that (1) the defendant was subject to a life sentence, mandatory or discretionary, natural or *de facto*, and (2) the sentencing court failed to consider youth and its attendant characteristics in imposing the sentence").

¶ 35    Additionally, the *Montgomery* Court held that *Miller* applied retroactively (*Montgomery*, 577 U.S. at ___, 136 S. Ct. at 736) but did not describe how. That is, the Court offered no guidance about how to determine whether a sentencing hearing held before *Miller* was decided nonetheless comported with its requirements.

_____

(U.S. Mar. 9, 2020), https://www.supremecourt.gov/qp/18-01259qp.pdf [https://perma.cc/3FD7-4V2J]. Jones v. Mississippi, therefore, will provide the Court with an opportunity to do what it did not do in *Miller*.

- 14 -

Again, this court did so in *Holman*. We stated that the inquiry looks back to the trial and the sentencing hearing to determine whether the trial court at that time considered evidence and argument related to the *Miller* factors. *Holman*, 2017 IL 120655, ¶ 47 ("In revisiting a juvenile defendant's life without parole sentence the only evidence that matters is evidence of the defendant's youth and its attendant characteristics at the time of sentencing."). No single factor is dispositive. Rather, we review the proceedings to ensure that the trial court made an informed decision based on the totality of the circumstances that the defendant was incorrigible and a life sentence was appropriate.

¶ 36    For each of the *Miller* factors listed in *Holman*, here is what the trial court in this case heard and considered.

¶ 37                    1. The Defendant's Chronological Age at the Time of the
                         Offense and Any Evidence of His Particular Immaturity,
                    Impetuosity, and Failure to Appreciate Risks and Consequences

¶ 38    The defendant was 16 when he murdered Happ. Phillips, his girlfriend at the time, testified that he left his mother's apartment on the night of the offenses carrying a revolver in the waist of his pants. He returned in a slightly excited or nervous state. The defendant testified that he lied about his age to Happ in order to improve his chances to have a sexual relationship with her. He added that at the time he was already experienced in such matters. The defendant admitted that days after Happ was killed he fled Joliet for Chicago, where he stayed with a relative for several months, to avoid being incarcerated for an unrelated shooting.

¶ 39    The trial court reviewed the PSI report, which outlined the charges against the defendant and noted that he had nothing to add when asked about them. At sentencing, both the State and the defense highlighted the defendant's age at the time of the office. The trial court commented that the defendant's age was "a factor" in that he was not eligible for the death penalty, despite the facts of the case. The court acknowledged that the defendant committed the offenses at a young age and that "youthful choices can be *** in very very poor judgment." The court, however, concluded that the defendant's conduct could not be taken back or considered minor.

- 15 -

¶ 40                    2. The Defendant's Family and Home Environment

¶ 41        At trial, the evidence showed that the defendant lived with his mother and two sisters in a Joliet apartment. According to the PSI report, he moved to Chicago during high school but was expelled after tenth grade for "gang banging" and moved back to Joliet. The defendant stated that he enjoyed spending time with his family. The defendant further stated that he had a good relationship with both parents and they visited him in jail.

¶ 42                    3. The Defendant's Degree of Participation in the Homicide
                        and Any Evidence of Familial or Peer Pressures
                        That May Have Affected Him

¶ 43        Phillips testified that the defendant, Williams, and Carpenter left the defendant's mother's apartment shortly before Happ was killed and returned shortly thereafter. There was no evidence presented at trial that anyone except the defendant was responsible for her murder. And there was no evidence that peer pressure led him to kill her. Again, the PSI report showed that the defendant was expelled from a Chicago high school for "gang banging," but nothing in the record suggests that the offenses were gang related. The defendant reportedly had a good relationship with his family.

¶ 44                    4. The Defendant's Incompetence, Including His Inability
                        to Deal With Police Officers or Prosecutors and
                        His Incapacity to Assist His Own Attorneys

¶ 45        There was no evidence presented at trial regarding the defendant's incompetence. His testimony was clear, and his defense was vigorous. The defendant completed his GED while incarcerated as a juvenile. The PSI report indicated that he had a history of alcohol, marijuana, and PCP use, but he denied any current use and claimed to have completed drug treatment. The report did not mention any past or present mental health treatment or institutionalization. According to the probation officials, the defendant may benefit from counseling to control his violent tendencies.

¶ 46                              5. The Defendant's Prospects for Rehabilitation

¶ 47        The PSI report detailed the defendant's criminal history, which included a delinquency adjudication for aggravated discharge of a firearm, an adult conviction for robbery, an adult misdemeanor conviction for resisting a police officer, and an aggravated battery charge for an incident that occurred in the Will County jail, while he was awaiting trial in this case. The defendant also had an attempted obstruction of justice conviction under an alias.

¶ 48        At the sentencing hearing, Miller testified that, while he and the defendant were both incarcerated, the defendant attacked him in a dispute over the telephone. Miller suffered a broken nose and a broken orbital bone and required stitches in his lip. The defendant did not present any witnesses or offer any evidence at the hearing. He testified in allocution, expressing remorse that Happ had died, but continued to maintain his innocence. He informed the court that he was "rough around the edges" but, in the five years between her death and his arrest, he was never accused of murdering or raping anyone else.

¶ 49        According to the State, "the younger part of his life is an indication of what this guy's potential is, this is a dangerous individual and he will continue to be dangerous well into his senior citizen years." The State contended that the defendant had no rehabilitative potential—"he just doesn't have it in him." Defense counsel asked the court to consider the defendant's age and the fact that people learn through experience. According to defense counsel, no one remains the same from age 17 to age 47.

¶ 50        Thereafter, the court called Happ's murder "clearly a depraved act" that showed "absolutely no respect for human life." The court felt that it was difficult to consider any leniency in this case. The court found no statutory factors in mitigation applied but that many statutory factors in aggravation did apply. From "everything" that the court had seen and heard in this case, the defendant chose "a life of carrying weapons, a life of showing no respect for human life," so the court was not uncomfortable imposing the maximum sentence.

¶ 51        The defendant's motion to reconsider sentence again brought his age and rehabilitative potential to the trial court's attention. In ruling on the motion, the court reiterated that it was comfortable with the defendant's sentence. The court

stated that it looked at "everything," including the Code of Corrections, and that it took into account all the statutory factors in aggravation and mitigation in fashioning a sentence appropriate to the facts.

¶ 52    The defendant had every opportunity to present mitigating evidence but chose not to offer any. See *Holman*, 2017 IL 120655, ¶ 49 (citing *Montgomery*, 577 U.S. at ___, 136 S. Ct. at 736); see also *People v. Croft*, 2018 IL App (1st) 150043, ¶ 33. The trial court presided over the case from beginning to end and considered the defendant's youth and its attendant characteristics before concluding that his future should be spent in prison. The defendant's *de facto* discretionary life sentence passes constitutional muster under *Miller*. Accordingly, the defendant has not shown prejudice under section 122-2(f).

¶ 53    CONCLUSION

¶ 54    For the reasons that we have stated, we reverse the appellate court's judgment and affirm the trial court's decision to deny the defendant's motion for leave to file a successive postconviction petition.

¶ 55    Appellate court judgment reversed.

¶ 56    Circuit court judgment affirmed.

¶ 57    JUSTICE NEVILLE, dissenting:

¶ 58    Following a jury trial in the circuit court of Will County, defendant, Ashanti Lusby, was convicted of first degree murder, aggravated criminal sexual assault, and home invasion. Defendant was 16 years old at the time of the offenses. The trial court sentenced defendant to a discretionary *de facto* life sentence of 130 years' imprisonment. Defendant subsequently filed a motion for leave to file a successive petition for relief pursuant to the Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq.* (West 2014)). Defendant asserted that his *de facto* life sentence violated the eighth amendment to the United States Constitution (U.S. Const., amend. VIII) because the trial court did not consider his youth and attendant characteristics as directed by *Miller v. Alabama*, 567 U.S. 460 (2012). The appellate court correctly

remanded the case to the trial court for resentencing. 2018 IL App (3d) 150189, ¶ 29.

¶ 59    However, my colleagues in the majority now hold that defendant's *de facto* life sentence of 130 years "passes constitutional muster" under *Miller*. *Supra* ¶ 52. Accordingly, they hold that defendant has not demonstrated the requisite prejudice to file a successive postconviction petition. *Supra* ¶ 52. I respectfully disagree.

¶ 60    The majority opinion overlooks the essential principle of eighth amendment juvenile sentencing jurisprudence that a *de facto* life sentence for a juvenile offender is rare and uncommon. Also, I disagree with the majority's application of established eighth amendment principles to the facts presented in this case. I would hold that defendant's 130-year sentence violates the eighth amendment and would remand the case to the trial court for a new sentencing hearing. Accordingly, I respectfully dissent.

¶ 61                    I. POSTCONVICTION PROCEDURAL BACKGROUND

¶ 62    The majority correctly sets out the procedural posture of this case. Defendant is required to satisfy the "cause and prejudice" test to file a successive postconviction petition. 725 ILCS 5/122-1(f) (West 2014); *People v. Pitsonbarger*, 205 Ill. 2d 444, 462 (2002). To establish "cause," a defendant must show some objective factor external to the defense that impeded his or her ability to raise the claim in the initial postconviction proceeding. *Pitsonbarger*, 205 Ill. 2d at 460. To establish "prejudice," the defendant must show that the claimed constitutional error so infected the proceeding that the resulting conviction or sentence violated due process. *Id.* at 464.

¶ 63    Before this court, the State correctly concedes that defendant established "cause." Defendant could not have raised his *Miller* claim in his initial postconviction petition because it predated *Miller*. *Supra* ¶ 23 (citing *People v. Davis*, 2014 IL 115595, ¶ 42).

¶ 64    The appellate court found that defendant was prejudiced because the trial court did not consider defendant's youth and attendant characteristics before sentencing him to *de facto* life imprisonment. 2018 IL App (3d) 150189, ¶ 28. However, the

majority concludes that the trial court "considered the defendant's youth and its attendant characteristics before concluding that his future should be spent in prison." *Supra* ¶ 52.

¶ 65 For the following reasons, I conclude that defendant's 130-year *de facto* life sentence violates the eighth amendment. Therefore, I would hold that defendant satisfies the prejudice requirement for filing a successive postconviction petition.

¶ 66                                   II. EIGHTH AMENDMENT ANALYSIS

¶ 67 I agree with the majority that "[t]he relevant legal principles are familiar." *Supra* ¶ 32. However, the majority's analysis necessitates a review of eighth amendment juvenile sentencing jurisprudence.

¶ 68                                       A. Foundational Principles

¶ 69 The United States Constitution prohibits "cruel and unusual punishments" (U.S. Const., amend. VIII) and applies to the states through the fourteenth amendment (U.S. Const., amend. XIV). *Roper v. Simmons*, 543 U.S. 551, 560 (2005). "Inherent in that prohibition is the concept of proportionality. [Citation.] Criminal punishment should be 'graduated and proportioned to both the offender and the offense.' " *People v. Holman*, 2017 IL 120655, ¶ 33 (quoting *Davis*, 2014 IL 115595, ¶ 18); accord *People v. Buffer*, 2019 IL 122327, ¶ 15. "When the offender is a juvenile and the offense is serious, there is a genuine risk of disproportionate punishment. *** [T]he United States Supreme Court addressed that risk and unmistakably instructed that youth matters in sentencing." *Holman*, 2017 IL 120655, ¶ 33. The Court has held that the eighth amendment prohibits capital sentences for juveniles who commit murder (*Roper*, 543 U.S. at 578-79), mandatory life sentences for juveniles who commit nonhomicide offenses (*Graham v. Florida*, 560 U.S. 48, 82 (2010)), and mandatory life sentences for juveniles who commit murder (*Miller*, 567 U.S. at 489). See *Holman*, 2017 IL 120655, ¶ 33; *Buffer*, 2019 IL 122327, ¶ 16. Further, this court has applied the principles in these United States Supreme Court decisions to mandatory *de facto* life sentences for juveniles (*People v. Reyes*, 2016 IL 119271, ¶ 9) and discretionary sentences of life without parole for juveniles (*Holman*, 2017 IL 120655, ¶ 40).

¶ 70        "*Roper*, *Graham*, and *Miller* established that 'children are constitutionally different from adults for purposes of sentencing.' " *Buffer*, 2019 IL 122327, ¶ 16 (quoting *Miller*, 567 U.S. at 471). We have summarized the three significant characteristics of juvenile offenders recognized by the Supreme Court as follows:

> "First, juveniles are more immature and irresponsible than adults. [Citation.] Second, juveniles are more vulnerable to negative influences and pressures from family and peers than adults. [Citation.] And third, juveniles are more malleable than adults—their characters are less fixed and their malfeasance is less indicative of irretrievable depravity. [Citation.] Those differences lessen juveniles' moral culpability and enhance their prospects for reform." *Holman*, 2017 IL 120655, ¶ 35 (citing *Miller*, 567 U.S. at 471-72).

*Graham*, *Roper*, and *Miller* teach that, in imposing the State's harshest penalties, a sentencing court misses too much if it treats every child as an adult. *Miller*, 567 U.S. at 477. Indeed, the Supreme Court took pains to emphasize its reasoning as follows:

> "To recap: Mandatory life without parole for a juvenile precludes consideration of his chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences. It prevents taking into account the family and home environment that surrounds him—and from which he cannot usually extricate himself—no matter how brutal or dysfunctional. It neglects the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him. Indeed, it ignores that he might have been charged and convicted of a lesser offense if not for incompetencies associated with youth—for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys. [Citations.] And finally, this mandatory punishment disregards the possibility of rehabilitation even when the circumstances most suggest it." *Id.* at 477-78.

See *Buffer*, 2019 IL 122327, ¶ 19 (citing *Miller*, 567 U.S. at 477-78); *Holman*, 2017 IL 120655, ¶ 37 (same).

¶ 71        The Supreme Court in *Miller* declared:

"We therefore hold that the Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders. [Citation.] By making youth (and all that accompanies it) irrelevant to imposition of that harshest prison sentence, such a scheme poses too great a risk of disproportionate punishment." *Miller*, 567 U.S. at 479.

¶ 72        In *Miller*, the Supreme Court declined to consider whether "the Eighth Amendment requires a categorical bar on life without parole for juveniles, or at least for those 14 and younger." *Id.* However, the Court reasoned:

"[G]iven all we have said *** about children's diminished culpability and heightened capacity for change, we think appropriate occasions for sentencing juveniles to the harshest possible penalty will be uncommon. That is especially so because of the great difficulty *** of distinguishing at this early age between 'the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption.' [Citations.] Although we do not foreclose a sentencer's ability to make that judgment in homicide cases, we require it to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." *Id.* at 479-80.

See *Buffer*, 2019 IL 122327, ¶ 21 (citing *Miller*, 567 U.S. at 479-80); *Holman*, 2017 IL 120655, ¶ 36 (same).

¶ 73        In *Montgomery v. Louisiana*, 577 U.S. ___, ___, 136 S. Ct. 718, 734 (2016), the Supreme Court clarified that *Miller* established both a substantive and a procedural requirement:

"*Miller*, it is true, did not bar a punishment for all juvenile offenders, as the Court did in *Roper* or *Graham*. *Miller* did bar life without parole, however, for all but the rarest of juvenile offenders, those whose crimes reflect permanent incorrigibility. For that reason, *Miller* is no less substantive than are *Roper* and *Graham.* Before *Miller*, every juvenile convicted of a homicide offense could be sentenced to life without parole. After *Miller*, it will be the rare juvenile offender who can receive that same sentence. The only difference between *Roper* and *Graham*, on the one hand, and *Miller*, on the other hand, is that *Miller*

- 22 -

drew a line between children whose crimes reflect transient immaturity and those rare children whose crimes reflect irreparable corruption."

¶ 74     The Court in *Montgomery* added: "To be sure, *Miller*'s holding has a procedural component. *Miller* requires a sentencer to consider a juvenile offender's youth and attendant characteristics before determining that life without parole is a proportionate sentence." *Id.* at ___, 136 S. Ct. at 734. The Court explained:

> "A hearing where 'youth and its attendant characteristics' are considered as sentencing factors is necessary to separate those juveniles who may be sentenced to life without parole from those who may not. [Citation.] The hearing does not replace but rather gives effect to *Miller*'s substantive holding that life without parole is an excessive sentence for children whose crimes reflect transient immaturity." *Id.* at ___, 136 S. Ct. at 735.

*Miller* applies retroactively to cases on state court collateral review. *Id.* at ___, ___, 136 S. Ct. at 729, 736; *Davis*, 2014 IL 115595, ¶¶ 22, 39.

¶ 75                                    B. The Majority Opinion

¶ 76     This survey of eighth amendment juvenile sentencing jurisprudence shows that this court is indeed familiar with these foundational principles and their application. In the case at bar, however, the majority overlooks and misapprehends these constitutional precepts and misapplies them to the facts in the record.

¶ 77     First, completely absent from the majority's discussion of the controlling eighth amendment jurisprudence is any reference to the fundamental principle that a *de facto* life sentence for a juvenile offender is "rare" and "uncommon." *Montgomery*, 577 U.S. at ___, ___, 136 S. Ct. at 726, 734; *Miller*, 567 U.S. at 479. This oversight skews the majority's analysis and contributes to its constitutionally erroneous holding.

¶ 78     Second, the majority misapprehends the trial court's findings at the sentencing hearing, which did not address defendant's youth and attendant characteristics. Third, the majority misperceives facts in the record that pertain to defendant's family environment. Fourth, the majority neglects to analyze explicit evidence in

the record that supports the possibility of defendant's rehabilitation.

¶ 79                    1. *De Facto* Life Sentences Are Reserved for
                              Only *Rare* Juvenile Offenders

¶ 80        The majority overlooks that the United States Supreme Court and this court
have repeatedly declared that life sentences are reserved for "uncommon," "rare,"
or "the rarest of" children. *Montgomery*, 577 U.S. at ___, ___, 136 S. Ct. at 726,
734; *Miller*, 567 U.S. at 479; see *Graham*, 560 U.S. at 73; *Roper*, 543 U.S. at 572-
73; *Buffer*, 2019 IL 122327, ¶ 21; *Holman*, 2017 IL 120655, ¶ 37. This repeated
limiting language, grounded in the mitigating factors of youth and its attendant
characteristics, establishes a presumption against imposing a life sentence or its
functional equivalent on a juvenile offender. See *Davis v. State*, 2018 WY 40, ¶ 45,
415 P.3d 666, 681 (collecting cases); *Commonwealth v. Batts*, 163 A.3d 410, 452
(Pa. 2017). Indeed, *Holman* recognized this presumption in setting forth the
Supreme Court's reliance on youth and its attendant characteristics as follows:

> "Under *Miller* and *Montgomery*, a juvenile defendant may be sentenced to
> life imprisonment without parole, *but only if* the trial court determines that the
> defendant's conduct showed irretrievable depravity, permanent incorrigibility,
> or irreparable corruption beyond the possibility of rehabilitation. The court may
> make that decision *only after* considering the defendant's youth and its
> attendant characteristics. Those characteristics include, but are not limited to,
> the following factors: (1) the juvenile defendant's chronological age at the time
> of the offense and any evidence of his particular immaturity, impetuosity, and
> failure to appreciate risks and consequences; (2) the juvenile defendant's family
> and home environment; (3) the juvenile defendant's degree of participation in
> the homicide and any evidence of familial or peer pressures that may have
> affected him; (4) the juvenile defendant's incompetence, including his inability
> to deal with police officers or prosecutors and his incapacity to assist his own
> attorneys; and (5) the juvenile defendant's prospects for rehabilitation."
> (Emphases added.) *Holman*, 2017 IL 120655, ¶ 46 (citing *Miller*, 567 U.S. at
> 477-78).

Accordingly, in sentencing a juvenile, the balance of aggravating and mitigating
factors "must be considered in a different light. The factors in aggravation and

mitigation must be filtered through the lens of youth and the specific propensities that come with immaturity." *People v. Johnson*, 2020 IL App (3d) 130543-B, ¶ 34.

¶ 81 Nothing in the trial court's findings at defendant's sentencing hearing indicates that the trial court applied any presumption against imposing a *de facto* life sentence on a juvenile. *Supra* ¶¶ 18-19. This oversight rendered the trial court's sentencing decision unconstitutional. In addition, the majority's failure to recognize the rarity of *de facto* life sentences for juveniles skews its review away from the constitutional presumption against such sentences.

¶ 82 2. Trial Court Did Not Explicitly Consider *Miller* Factors

¶ 83 At the beginning of the sentencing hearing, the trial court expressly stated that it had reviewed the presentence investigation (PSI) report. Further, the trial court expressly referred to defendant's age twice in the course of its sentencing determination. First, the court observed that defendant's age was a factor "to the extent that he is not eligible for the imposition of capital punishment." Second, the trial court stated:

> "This is a choice that you made at a young age and I know that choices, youthful choices can be—are not, you know, sometimes are [*sic*] sometimes in very very poor judgment, but this is not one that can be taken back, and this is not one that can be considered minor, and this is not one that can be considered for anything but setting your future in the Department of Corrections."

¶ 84 The record clearly shows that the trial court did not consider the attendant characteristics of defendant's youth. A trial court's mere awareness of a juvenile defendant's age and consideration of a PSI does not show that the court considered the defendant's youth and attendant characteristics. See *People v. Figueroa*, 2020 IL App (1st) 172390, ¶ 37 (citing *People v. Harvey*, 2019 IL App (1st) 153581, ¶ 13); *People v. Peacock*, 2019 IL App (1st) 170308, ¶¶ 23-24.

¶ 85 Further, I observe that the trial court countered one of its two explicit references to defendant's youth with a reference to this particular offense. However, this consideration directly contravenes the teachings of eighth amendment jurisprudence. The Supreme Court emphasized in *Miller* that "the distinctive

attributes of youth diminish the penological justifications for imposing the harshest sentences on juvenile offenders, even when they commit terrible crimes." *Miller*, 567 U.S. at 472. Indeed, "*Miller*'s central intuition [is] that children who commit even heinous crimes are capable of change." *Montgomery*, 577 U.S. at ___, 136 S. Ct. at 736.

¶ 86    Because the trial court focused on the brutality of the crime and the need to protect the public, with no corresponding consideration given to defendant's youth and its attendant characteristics, the imposition of a life sentence on this juvenile defendant was unconstitutional. See *People v. Paige*, 2020 IL App (1st) 161563, ¶ 40; *Batts*, 163 A.3d at 437 (same); *State v. Riley*, 110 A.3d 1205, 1217 (Conn. 2015) (same).

¶ 87            3. Majority Misperceives Evidence of Defendant's Family Environment

¶ 88    Absent from the trial court's sentencing determination is any consideration of defendant's family and home environment. Here, in reciting information from defendant's PSI, the majority mentions that "defendant had two sisters" and that, according to defendant, "he had a good relationship with his parents and that they visited him often in jail, though the officials found no record that the defendant's father had been there." *Supra* ¶ 12. In its analysis regarding defendant's "Family and Home Environment" (*supra* ¶¶ 40-41), the majority opinion describes "what the trial court in this case heard and considered" (*supra* ¶ 36), in total, as follows:

> "At trial, the evidence showed that the defendant lived with his mother and two sisters in a Joliet apartment. According to the PSI report, he moved to Chicago during high school but was expelled after tenth grade for 'gang banging' and moved back to Joliet. The defendant stated that he enjoyed spending time with his family. The defendant further stated that he had a good relationship with both parents, and they visited him in jail." *Supra* ¶ 41.

¶ 89    This description misperceives facts in the record. In this case, the PSI expressly reports that defendant is the middle child of three siblings. Defendant committed his crimes in 1996 at age 16. His older sister committed theft in 1998 at age 23, and his younger sister committed theft in 1999 at age 17. Defendant's siblings' involvement in criminal activity is evidence that indicates a dysfunctional home

- 26 -

environment, which is a recognized mitigating factor against imposing a *de facto* life sentence on a juvenile offender. See *Miller*, 567 U.S. at 477; *Buffer*, 2019 IL 122327, ¶ 19; *Holman*, 2017 IL 120655, ¶ 37 (both quoting *Miller*). Further, the PSI reported defendant's relationship with his parents as follows:

> "The defendant stated that he has a good relationship with both parents and that they visit him often in jail. According to the Will County Adult Detention Facility, *the defendant's father is not even listed as one of the defendant's visitors, and there is no record that he has ever visited. The undersigned officer was unable to verify the defendant's parental relationship.*" (Emphasis added.)

¶ 90        One of the ways that children are constitutionally different from adults for purposes of sentencing is that juveniles are more vulnerable to negative influences and pressures from family than adults. *Miller*, 567 U.S. at 471 (citing *Roper*, 543 U.S. at 569); *Holman*, 2017 IL 120655, ¶¶ 35, 37. In sentencing a juvenile offender, a trial court must take into account any information in the record regarding "the family and home environment that surrounds him—and from which he cannot usually extricate himself—no matter how brutal or dysfunctional." *Miller*, 567 U.S. at 477. Recognized vulnerabilities include childhood abuse, parental neglect or lack of supervision, prior exposure to violence, and the juvenile's susceptibility to psychological or emotional damage. *Id.* at 475-79. Defendant's perception that "he had a good relationship with both parents" is very different from what is generally recognized as a "traditional" family relationship. The trial court should have considered as mitigating factors the family and home environment vulnerabilities of defendant's father's failure to parent, by not living with and never visiting defendant in prison, and defendant's mother's failure to parent, by not preventing defendant and his sisters from becoming involved in the criminal justice system. The trial court should have considered these mitigating factors coupled with a juvenile's lack of maturity, underdeveloped sense of responsibility, and vulnerability to peer pressure. *Id.*; see *State v. Seats*, 865 N.W.2d 545, 556 (Iowa 2015) (citing *Miller*). Defendant apparently perceived all of this to be normal.

¶ 91        In light of *Miller*, this evidence indicating a dysfunctional family and home environment clearly indicates the need for further investigation. The trial court's failure to express any consideration of this attendant characteristic of youth renders

defendant's *de facto* life sentence unconstitutional.

¶ 92                    4. Record Contains Evidence Supporting Possibility of Rehabilitation

¶ 93        Early in its opinion (*supra* ¶ 13), the majority recounted that defendant's PSI concluded with the following item:

> "SPECIAL RESOURCES FOR DEFENDANT:
>
> Presenting before the Court is a 23-year old male convicted of several counts of First Degree Murder, Aggravated Criminal Sexual Assault and Home Invasion. He has several violent offense convictions, no employment history and an admitted substance abuse history. *The defendant may benefit from counseling to control his violent tendencies.*" (Emphasis added.)

However, this recommendation is absent from the majority opinion's analysis. See *supra* ¶¶ 47-52.

¶ 94        In its discussion of the *Miller* factors, the majority opinion states: "No single factor is dispositive." *Supra* ¶ 35. This statement is constitutionally incorrect. Consideration of a juvenile defendant's capacity for rehabilitation is crucial, if not dispositive, in the *Miller* analysis. As the Supreme Court explained in *Montgomery*:

> "Even if a court considers a child's age before sentencing him or her to a lifetime in prison, that sentence still violates the Eighth Amendment for a child whose crime reflects unfortunate yet transient immaturity. [Citation.] Because *Miller* determined that sentencing a child to life without parole is excessive for all but the rare juvenile offender whose crime reflects irreparable corruption [citation], it rendered life without parole an unconstitutional penalty for a class of defendants because of their status—that is, juvenile offenders whose crimes reflect the transient immaturity of youth." (Internal quotation marks omitted.) *Montgomery*, 577 U.S. at ___, 136 S. Ct. at 734.

A life sentence " 'forswears altogether the rehabilitative ideal.' [Citation.] It reflects 'an irrevocable judgment about [an offender's] value and place in society,' at odds with a child's capacity for change." *Miller*, 567 U.S. at 473 (quoting *Graham*, 560 U.S. at 74). As we instructed in *Holman*:

"Under *Miller* and *Montgomery*, a juvenile defendant may be sentenced to life imprisonment without parole, *but only* if the trial court determines that the defendant's conduct showed irretrievable depravity, permanent incorrigibility, or irreparable corruption *beyond the possibility of rehabilitation*. The court may make that decision only after considering the defendant's youth and its attendant characteristics." (Emphases added.) *Holman*, 2017 IL 120655, ¶ 46.

¶ 95 At defendant's original sentencing hearing, the trial court stated that it had reviewed the PSI. Again, however, nothing in the trial court's findings indicates that the court considered this express recommendation from defendant's own parole officer that defendant could benefit from available counseling resources. This recommendation alone indicates that defendant is *not irretrievably* depraved, *permanently* incorrigible, or *irreparably* corrupt *beyond the possibility* of rehabilitation. A determination that defendant had the potential to rehabilitate would contravene any conclusion that he was permanently incorrigible or irretrievably depraved and, therefore, would be unconstitutionally at odds with a *de facto* life sentence without parole for a juvenile offender. See *People v. Murphy*, 2019 IL App (4th) 170646, ¶ 48. Again, the trial court's failure to expressly consider this crucial evidence renders its sentencing determination unconstitutional.

¶ 96 On review, the majority opinion again demonstrates how it is erroneously skewed away from the constitutional presumption against life sentences for juveniles. Initially, in its discussion of defendant's PSI, the majority overlooks that defendant's parole officer recommended available counseling services for defendant. See *supra* ¶¶ 47-52. Further, the majority described the trial court's sentencing determination as follows: "From 'everything' that the court had seen and heard in this case, the defendant chose 'a life of carrying weapons, a life of showing no respect for human life,' so the court was not uncomfortable imposing the maximum sentence." *Supra* ¶ 50.

¶ 97 Again, the majority overlooks the constitutional principle that defendant's supposed "choices" must be presumed to be based on "the transient immaturity of youth" (*Montgomery*, 577 U.S. at ___, 136 S. Ct. at 734) until those choices are shown to be based on irretrievable depravity, permanent incorrigibility, or irreparable corruption. *Holman*, 2017 IL 120655, ¶ 46.

¶ 98 The majority opinion notes that defense counsel and the prosecutor mentioned these considerations in their arguments. However, as the court in *Figueroa* observed:

> "Most importantly, the trial court did not assess defendant's prospects for rehabilitation. It is true that the prosecutor and defense counsel addressed these points, to varying degrees, in their arguments. But that did not relieve the trial court of its obligation to 'take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison,' before sentencing defendant to a *de facto* life term." *Figueroa*, 2020 IL App (1st) 172390, ¶ 37 (quoting *Miller*, 567 U.S. at 480).

Our appellate court has repeatedly held that a trial court's failure to expressly consider a juvenile offender's potential for rehabilitation renders a life sentence unconstitutional under the eighth amendment and requires a new sentencing hearing. See *People v. Gregory*, 2020 IL App (3d) 190261, ¶¶ 40-42 (trial court made no comments from which appellate court could infer finding that the defendant was beyond the possibility of rehabilitation); *People v. Reyes*, 2020 IL App (2d) 180237, ¶ 31 ("the record does not show that the trial court made any determination that the defendant was beyond rehabilitation or that the defendant's conduct reflected permanent incorrigibility"); *Paige*, 2020 IL App (1st) 161563, ¶¶ 39-40 (where evidence was presented on potential for the defendant's rehabilitation and where trial court focused on brutality of crime, "with no corresponding consideration given to defendant's opportunity for rehabilitation, the imposition of a life sentence on a juvenile defendant was unconstitutional"); *People v. Thornton*, 2020 IL App (1st) 170677, ¶ 25 (because trial court failed to "consider the defendant's rehabilitative potential," appellate court "must conclude that the defendant's sentence violates the eighth amendment, and *** vacate that sentence as unconstitutional").

¶ 99 The trial court's failure to consider this crucial factor renders defendant's 130-year *de facto* life sentence unconstitutional and is dispositive of this appeal. The majority opinion's analysis of eighth amendment juvenile sentencing jurisprudence is constitutionally erroneous.

¶ 100 III. CONCLUSION

¶ 101    There is no question that juvenile offenders who commit heinous murders deserve severe punishment. However, we cannot lose sight of the fact that juveniles are different from adults due to a juvenile's lack of maturity, underdeveloped sense of responsibility, vulnerability to peer pressure, and the less fixed nature of the juvenile's character. *Miller*, 567 U.S. at 471-73. Notwithstanding a juvenile defendant's diminished responsibility and greater capacity for reform that ordinarily distinguishes juveniles from adults, the question a trial court must answer at the time of sentencing is whether the juvenile is so irretrievably depraved, permanently incorrigible, or irreparably corrupt as to be beyond the possibility of rehabilitation and thus unfit ever to reenter society. *Montgomery*, 577 U.S. at ___, 136 S. Ct. at 734; *Miller*, 567 U.S. at 479-80; see *Buffer*, 2019 IL 122327, ¶ 21 (quoting *Miller*, 567 U.S. at 479-80); *Holman*, 2017 IL 120655, ¶ 36 (same); *Batts*, 163 A.3d at 439 (same); *Seats*, 865 N.W.2d at 558.

¶ 102    The trial court did not come close to satisfying the United States Supreme Court's eighth amendment requirements for sentencing juvenile offenders or the Illinois Constitution's requirement that penalties be determined with the objective of restoring the offender to useful citizenship. Ill. Const. 1970, art. I, § 11.

¶ 103    I note that defendant's sentencing hearing, held in 2002, predated the United States Supreme Court's decisions in *Miller* (2012) and *Montgomery* (2016), and this court's decisions in *Holman* (2017) and *Buffer* (2019). Therefore, the trial court did not have the benefit of this eighth amendment jurisprudence. Where sentences imposed on juvenile defendants fail to comport with *Miller* and its progeny, this court and our appellate court have not hesitated to vacate the unconstitutional sentences and remand the cases for resentencing. See, *e.g.*, *Buffer*, 2019 IL 122327, ¶ 47; *Reyes*, 2016 IL 119271, ¶ 12; *Figueroa*, 2020 IL App (1st) 172390, ¶ 39; *Gregory*, 2020 IL App (3d) 190261, ¶ 42; *Paige*, 2020 IL App (1st) 161563, ¶ 40; *Thornton*, 2020 IL App (1st) 170677, ¶ 26; *People v. Smolley*, 2018 IL App (3d) 150577, ¶ 22; *People v. Craighead*, 2015 IL App (5th) 140468, ¶ 19; *People v. Luciano*, 2013 IL App (2d) 110792, ¶¶ 62-63. I conclude that the appellate court correctly followed the aforementioned cases.

¶ 104    The majority errs in holding that defendant's discretionary *de facto* life sentence of 130 years' imprisonment "passes constitutional muster." *Supra* ¶ 52. I would hold that defendant satisfies the prejudice requirement for filing a successive

postconviction petition. Therefore, I would affirm the judgment of the appellate court, which correctly reversed the denial of defendant's motion for leave to file a successive postconviction petition and remanded the case to the trial court for resentencing.

¶ 105 Accordingly, I respectfully dissent.

¶ 106 **SEPARATE OPINION UPON DENIAL OF REHEARING**

¶ 107 JUSTICE NEVILLE, dissenting:

¶ 108 Defendant filed a petition for rehearing in this case. Defendant requests that the majority reconsider its erroneous holding. Now, a majority of this court has denied rehearing. I disagree for five reasons. First, the majority overlooks the eighth amendment presumption against life sentences for juvenile offenders. Second, the trial court failed to apply the *Miller* factors. Third, the majority fails to apply the eighth amendment's presumption of immaturity. Fourth, the majority refuses to consider the specific attendant characteristics of defendant's youth. Fifth, the majority precludes defendant from resentencing under our current juvenile sentencing scheme. Also, in light of the majority's recalcitrance in refusing to protect defendant's eighth amendment rights, I recommend additional legislation. Therefore, I respectfully dissent from the denial of rehearing.

¶ 109 I. BACKGROUND

¶ 110 The trial court sentenced defendant, who was 16 years old at the time of the offenses, to 130 years' imprisonment. The trial court's five-paragraph sentencing determination, in full, was as follows:

"[T]his is a case that is a very difficult case from the standpoint of the facts of the injuries and of the method of murder of the victim. It certain—certainly the defendant's age is a factor at the very least to the extent that he is not eligible for the imposition of capital punishment based solely because of his age, because but for his age at under the age of 18, certainly this—these are the type of things, let me put it that way, that I have seen that all the attorneys that are

in this trial have seen as facts that would—that could be considered capital punishment activities.

But I cannot, I cannot ignore the fact that Miss Happ was terrorized and sexually assaulted and humiliated and executed in her own home, and this was clearly a depraved act by you, Mr. Lusby, and it shows absolutely no respect for human life. It is ironic to me I guess that this Miss Happ was working to provide a positive influence on children in the area and the area that you lived in and even children that were—would be yours or your nieces or nephews or other family members might have been influenced positively by this woman, but your actions saw that didn't happen.

So it is very difficult for me to consider any leniency in this case. It is very difficult for me to see any factors in mitigation. I have gone through the section on mitigation. There are no factors in mitigation that apply.

I have gone through the factors in aggravation and those factors there are many that apply, and I sincerely believe that the appropriate sentence is a sentence that will see that this does not occur outside of the Department of Corrections again. This is a choice that you made at a young age and I know that choices, youthful choices can be—are not, you know, sometimes are sometimes in very very poor judgment, but this is not one that can be taken back, and this is not one that can be considered minor, and this is not one that can be considered for anything but setting your future in the Department of Corrections.

From what I've seen here from everything that I have seen and heard in this trial this is a life you chose, a life of carrying weapons, a life of showing no respect for human life, and I am not at all uncomfortable in imposing the maximum sentence on the murder of 100 years. The consecutive sentence on the other two Class X offenses again the manner and method of this crime makes me convinced that it is not for me to minimize it in any way, and as a consequence I will impose an additional consecutive 30 years on each of these offenses. So that is the order of the Court."

¶ 111    In the course of postconviction proceedings, the appellate court determined that the trial court did not consider defendant's youth and attendant characteristics

before sentencing him to *de facto* life imprisonment. Therefore, the appellate court held that defendant's sentence violated the eighth amendment under *Miller v. Alabama*, 567 U.S. 460 (2012). The appellate court remanded the case to the trial court for resentencing. 2018 IL App (3d) 150189, ¶¶ 28-29.

¶ 112     The majority held that defendant's discretionary *de facto* life sentence "passes constitutional muster." *Supra* ¶ 52. As I set forth in my original dissent, the majority's decision was erroneous in several respects. The majority failed to recognize dispositive legal principles (*supra* ¶¶ 79-81), ignored undisputed facts (*supra* ¶¶ 87-95), and misapplied the law to the facts (*supra* ¶¶ 82-86, 96-99). Further, the majority took the drastic step of rescinding defendant's opportunity for a new sentencing hearing, which the appellate court had granted (*supra* ¶ 103).

¶ 113                                    II. ANALYSIS

¶ 114                    A. Majority Fails to Recognize Eighth Amendment
                      Presumption Against Life Sentences for Juvenile Offenders

¶ 115     Defendant argues that the trial court failed to apply any presumption against imposing a *de facto* life sentence on a juvenile. I agree.

¶ 116     As I explained in my original dissent, life sentences are reserved for "uncommon," "rare," or "the rarest of" juvenile offenders. This constitutional limitation, "grounded in the mitigating factors of youth and its attendant characteristics, establishes a presumption against imposing a life sentence or its functional equivalent on a juvenile offender." *Supra* ¶ 80 (and cases cited therein). Accordingly, in sentencing a juvenile, the trial court must balance the factors in aggravation and mitigation through the lens of youth and its attendant characteristics. *Supra* ¶ 80.

¶ 117     In this case, defendant correctly argues that the trial court failed to apply any presumption against imposing a discretionary *de facto* life sentence on a juvenile. "This oversight rendered the trial court's sentencing decision unconstitutional." *Supra* ¶ 81. Further, as I maintained in my original dissent, "completely absent from the majority's discussion of the controlling eighth amendment jurisprudence is any reference to the fundamental principle that a *de facto* life sentence for a juvenile

offender is 'rare' and 'uncommon.' [Citations.] This oversight skews the majority's analysis and contributes to its constitutionally erroneous holding." *Supra* ¶ 77. Rehearing should be granted to allow the majority the opportunity to recognize in this case the controlling eighth amendment presumption against imposing a life sentence for a juvenile offender and to allow this court to review the trial court's failure to apply the presumption in sentencing defendant.

¶ 118          B. Trial Court Failed to Apply *Miller* Factors

¶ 119          Defendant argues that "the majority pointed to no instance in the record where the trial court considered any specific characteristic described by *Miller* as mitigating." Again, I must agree.

¶ 120          Not only did the trial court fail to apply any presumption against imposing a discretionary *de facto* life sentence on a juvenile, but further, the trial court failed to apply *any* of the *Miller* factors to its sentencing determination. As I explained in my original dissent, the trial court mentioned defendant's age only twice in the course of its sentencing determination. Further, the trial court countered one of those references with a reference to this particular offense. "[T]he truth of *Miller*'s central intuition [is] that children who commit even heinous crimes are capable of change." *Montgomery v. Louisiana*, 577 U.S. ___, ___, 136 S. Ct. 718, 736 (2016). "Because the trial court focused on the brutality of the crime and the need to protect the public, with no corresponding consideration given to defendant's youth and its attendant characteristics, the imposition of a life sentence on this juvenile defendant was unconstitutional." *Supra* ¶ 86.

¶ 121          C. Majority Fails to Apply Eighth Amendment Presumption of Immaturity

¶ 122          Defendant next asserts that the majority wrongly focused on his opportunity to present mitigating evidence, rather than on whether the trial court made the constitutionally required determination that defendant was the rare juvenile offender who is beyond rehabilitation. I agree.

¶ 123          At defendant's sentencing hearing, the parties relied on the facts of the case and a sparse PSI to determine what traditional statutory aggravating and mitigating

factors applied. Before this court, the majority recited evidence adduced at trial and sentencing that related to the *Miller* factors. *Supra* ¶¶ 36-49. The majority concluded: "The defendant had every opportunity to present mitigating evidence but chose not to offer any." *Supra* ¶ 52.

¶ 124　　Again, completely absent from the majority's analysis is any recognition that *de facto* life sentences for juvenile offenders are *presumed* to be unconstitutional. *Miller* barred life sentences "for all but the rarest of juvenile offenders, those whose crimes reflect permanent incorrigibility. *** *Miller* drew a line between children whose crimes reflect transient immaturity and those rare children whose crimes reflect irreparable corruption." *Montgomery*, 577 U.S. at ___, 136 S. Ct. at 734. In my original dissent, I quoted from *People v. Holman*, 2017 IL 120655, in which this court recognized the presumption against imposing a *de facto* life sentence against a juvenile offender as follows:

　　" 'Under *Miller* and *Montgomery*, a juvenile offender may be sentenced to life imprisonment without parole, *but only if* the trial court determines that the defendant's conduct showed irretrievable depravity, permanent incorrigibility, or irreparable corruption *beyond the possibility of rehabilitation*. The court may make that decision *only after* considering the defendant's youth and its attendant characteristics.' " (Emphases in original and added.) *Supra* ¶ 80 (quoting *Holman*, 2017 IL 120655, ¶ 46).

Again, the majority failed to presume that defendant's offenses were based on the transient immaturity of youth until those choices are shown to be based on irretrievable depravity, permanent incorrigibility, or irreparable corruption. *Supra* ¶¶ 96-97.

¶ 125　　In this case, the trial court failed to make any explicit or implicit finding of incorrigibility. This is contrary to the eighth amendment jurisprudence of the United States Supreme Court, which this court has recognized and is bound to follow. As I maintained in my original dissent:

　　"There is no question that juvenile offenders who commit heinous murders deserve severe punishment. *** [However,] the question a trial court must answer at the time of sentencing is whether the juvenile is so irretrievably depraved, permanently incorrigible, or irreparably corrupt as to be beyond the

possibility of rehabilitation and thus unfit ever to reenter society." *Supra* ¶ 101 (and cases cited therein).

¶ 126 Other courts have recognized this constitutional obligation. See, *e.g.*, *Miller*, 567 U.S. at 479 ("That Miller deserved severe punishment for killing [the victim] is beyond question. But once again, a sentencer needed to examine all these circumstances before concluding that life without any possibility of parole was the appropriate penalty."); *United States v. Briones*, 929 F.3d 1057, 1065 (9th Cir. 2019) ("Despite the harm caused by juveniles' criminal acts, *Miller* requires a sentencing analysis that accounts for the characteristics of youth that undermine the penological justification for lifelong punishment."); *People v. Padilla*, 2020 IL App (1st) 172106-U, ¶ 68 (acknowledging brutal nature of offense, but recognizing the constitutional mandate of determining whether the defendant "was among 'the rarest of juvenile offenders *** whose crimes reflect permanent incorrigibility' " (quoting *Montgomery*, 577 U.S. at ___, 136 S. Ct. at 734)); *Commonwealth v. Moye*, 224 A.3d 48, 57 (Pa. Super. 2019) ("pursuant to established United States Supreme Court precedent, the ultimate issue here is not the nature of the crime committed, but whether an offender is capable of rehabilitation"). *State v. Seats*, 865 N.W.2d 545, 557 (Iowa 2015) ("the nature of the crime *** cannot overwhelm the analysis in the context of juvenile sentencing").

¶ 127 *Miller* barred sentences of life without parole "for all but the rarest of juvenile offenders, those whose crimes reflect permanent incorrigibility." *Montgomery*, 577 U.S. at ___, 136 S. Ct. at 734. *Miller* and *Montgomery* mandate that "[a] hearing where youth and its attendant characteristics are considered as sentencing factors is necessary to separate those juveniles who may be sentenced to life without parole from those who may not." (Internal quotation marks omitted.) *Id.* at ___, 136 S. Ct. at 735. However, the majority's decision in this case allows juveniles like defendant to be locked in prison forever, even when such juveniles may be capable of rehabilitation. "Consideration of a juvenile defendant's capacity for rehabilitation is crucial, if not dispositive, in the *Miller* analysis." *Supra* ¶ 94. Rehearing is warranted to enable the majority to fulfill this constitutional obligation.

¶ 128
D. Majority Refuses to Consider Specific Attendant
Characteristics of Defendant's Youth

¶ 129    The petition for rehearing asserts that the majority failed to reconcile defendant's *de facto* life sentence with specific evidence in the record suggesting that defendant may be capable of rehabilitation. I agree.

¶ 130    Defendant agrees with my original dissent that the majority's analysis overlooked specific evidence on two subjects. First, the majority failed even to mention defendant's siblings' involvement in criminal activity, which is evidence that indicates a dysfunctional home environment and which is a constitutional mitigating factor against imposing a *de facto* life sentence on a juvenile offender. *Supra* ¶¶ 87-91. Second, completely absent from the analysis of the majority opinion is the clear and plain recommendation from defendant's own parole officer: " 'The defendant may benefit from counseling to control his violent tendencies.' " (Emphasis omitted.) *Supra* ¶¶ 92-95.

¶ 131    I continue to maintain that the trial court's failure to consider these crucial areas of evidence renders defendant's *de facto* life sentence of 130 years' imprisonment unconstitutional and is dispositive of this appeal. *Supra* ¶ 99. Defendant argues that, by removing this evidence from its constitutional analysis, "the majority thus effectively held that a life sentence imposed on a juvenile in Illinois may be constitutional, even if evidence suggests the juvenile is not incorrigible." Rehearing is necessary in order to provide an analysis that includes these undisputed facts.

¶ 132
E. Majority Precludes Defendant from Resentencing
Under Current Juvenile Sentencing Statute

¶ 133    In its appellant's brief, the State conceded: "The State does not dispute that defendant's 130-year aggregate sentence for crimes committed as a juvenile is the functional equivalent of life without parole." The majority fails to recognize that the Illinois General Assembly, in conformity with eighth amendment juvenile sentencing jurisprudence, is trending away from the type of *de facto* life sentence that the majority insists on imposing on defendant.

¶ 134    Following *Miller*, the Illinois General Assembly significantly changed our sentencing statutes for defendants under the age of 18 when they committed their offenses. Trial courts must now approach juvenile sentencing hearings through a completely different lens. Effective January 1, 2016, before *any* sentence is imposed, the sentencing court must consider several "additional factors in mitigation in determining the appropriate sentence." See Pub. Act 99-69, § 10 (eff. Jan. 1, 2016) (adding 730 ILCS 5/5-4.5-105). This list is taken from and is consistent with *Miller*'s discussion of a juvenile defendant's youth and its attendant characteristics. See *People v. Buffer*, 2019 IL 122327, ¶ 36. Also, the General Assembly has provided that juvenile offenders who are convicted of first degree murder and who are sentenced on or after June 1, 2019 (the effective date of Public Act 100-1182), are eligible for parole after 20 years, unless certain conditions exist. 730 ILCS 5/5-4.5-115(b) (West Supp. 2019).

¶ 135    By offering parole eligibility only prospectively to future juvenile offenders, the legislature has placed a high duty on the Illinois judicial system to ensure that juvenile homicide offenders sentenced to life in prison before June 1, 2019, receive a full and adequate hearing regarding their corrigibility at the time of sentencing. As I noted in my original dissent, "defendant's sentencing hearing, held in 2002, predated the United States Supreme Court's decisions in *Miller* (2012) and *Montgomery* (2016), and this court's decisions in *Holman* (2017) and *Buffer* (2019). Therefore, the trial court did not have the benefit of this eighth amendment jurisprudence." *Supra* ¶ 103. Accordingly, as defendant argues in his petition for rehearing, in cases such as this, where the defendant is not eligible for parole, judicial scrutiny of his sentencing hearing must be *more* vigilant, not less.

¶ 136    Rather than simply remand this case for a new sentencing hearing pursuant to our new juvenile sentencing statutes in conformity with *Miller*, the majority goes out of its way to affirm this juvenile offender's unconstitutional discretionary *de facto* life sentence of 130 years' imprisonment. As the *Montgomery* Court explained: "*Miller* requires a sentencer to consider a juvenile offender's youth and attendant characteristics before determining that life without parole is a proportionate sentence." *Montgomery*, 377 U.S. at ___, 136 S. Ct. at 734. The Illinois General Assembly has incorporated this principle in the new juvenile sentencing statute, which might afford defendant an opportunity for a parole hearing.

¶ 137    This court and our appellate court have recognized this principle by routinely reversing and remanding juvenile sentences predating *Miller* and *Montgomery* that do not take into account youth and its attendant characteristics. See *supra* ¶ 103 (collecting cases). Indeed, the United States Supreme Court has vacated juvenile sentences imposed *after Miller* and remanded for further proceedings. For example, in *Tatum v. Arizona*, 580 U.S. ___, 137 S. Ct. 11 (2016), the Court ordered new sentencing hearings for five different petitioners, each of whom had been sentenced to life imprisonment for crimes they committed as juveniles. The sentencing hearings in *Tatum* took place "after *Miller*, and in each case the court expressly assumed that *Miller* was applicable to the sentence that had been imposed." *Id.* at ___, 137 S. Ct. at 13 (Alito, J, dissenting, joined by Thomas, J.). In a concurring opinion, Justice Sotomayor acknowledged that the sentencing courts had considered the petitioners' youth during sentencing. However, "none of the sentencing judges addressed the question *Miller* and *Montgomery* require a sentencer to ask: whether the petitioner was among the very 'rarest of juvenile offenders, those whose crimes reflect permanent incorrigibility.' " *Id.* at ___, 137 S. Ct. at 12 (Sotomayor, J., concurring) (quoting *Montgomery*, 577 U.S. at ___, 136 S. Ct. at 734). Justice Sotomayor maintained:

> "It is clear after *Montgomery* that the Eighth Amendment requires more than mere consideration of a juvenile offender's age before the imposition of a sentence of life without parole. It requires that a sentencer decide whether the juvenile offender before it is a child 'whose crimes reflect transient immaturity' or is one of 'those rare children whose crimes reflect irreparable corruption' for whom a life without parole sentence may be appropriate. [*Montgomery*, 577 U.S. at ___, 136 S. Ct. at 734]. There is thus a very meaningful task for the lower courts to carry out on remand." *Id.* at ___, 137 S. Ct. at 13.

If the United States Supreme Court has deemed it necessary to vacate juvenile sentences imposed *after Miller* and remand for further proceedings, why does the majority refuse to do so in this case decided *before Miller*?

¶ 138    F. Sentencing Observation: Most People "Age Out" of Crime

¶ 139    In violation of *Miller* and *Montgomery*, the majority insists on imposing on defendant a discretionary *de facto* life sentence without a hearing where youth and

its attendant characteristics are considered to separate those juveniles who may be sentenced to life without parole from those who may not. In light of this recalcitrance in refusing to protect defendant's eighth amendment rights, I offer the following observations and recommendation for additional legislation.

¶ 140 In *Miller*, the Court recognized that "youth is more than a chronological fact. [Citation.] It is a time of immaturity, irresponsibility, impetuousness[,] and recklessness. [Citation.] It is a moment and condition of life when a person may be most susceptible to influence and to psychological damage. [Citation.] And its signature qualities are all transient." (Internal quotation marks omitted.) *Miller*, 567 U.S. at 476. The signature qualities of youth are transient because, as individuals mature, the impetuousness and recklessness that may dominate in younger years can subside. Indeed, for most teens, risky or antisocial behaviors are fleeting and cease with maturity as individual identity becomes settled. Only a relatively small proportion of juveniles who experiment in risky or illegal activities develop entrenched patterns of problem behavior that persist into adulthood. *Roper v. Simmons*, 543 U.S. 551, 570 (2005).

¶ 141 These insights support not only constitutional principles but also statistical reality:

> "The evidence is what's known as the age-crime curve. It shows that people tend to age out of crime. In their mid- to late teens and early 20s, people are much, much likelier to commit a crime than they are in their 30s and especially 40s and on.

> * * *

> There are exceptions, like lifelong serial killers. But they're few and far between, and could be handled with limited exceptions to a 20-year cap." German Lopez, *The Case for Capping All Prison Sentences at 20 Years*, Vox (Feb. 12, 2019), https://www.vox.com/future-perfect/2019/2/12/18184070/ maximum-prison-sentence-cap-mass-incarceration [https://perma.cc/N7X3-LSZN].

Additionally, scholars have opined:

"Knowing that most young people 'age out' of crime by their mid- to late-20s, it is counterproductive to subject them to an often-brutal prison environment. Yes, there need to be consequences for criminal behavior, but these should involve finding the appropriate balance between public safety and helping offenders address the factors that contributed to their crimes.

And if such an approach makes sense for juveniles it also can be adapted for adults. The life history of individuals in prison shows that, more often than not, they committed their crimes after major setbacks—addiction, loss of jobs or housing—for which they received little support. There are few individuals in the prison system so dangerous that they can never be released back into the community. If we truly want to end mass incarceration we need to change the mindset about crime to one that emphasizes prevention and restoration over punishment." *What We Can Learn From the Amazing Drop in Juvenile Incarceration*, Ashley Nellis & Marc Mauer, The Marshall Project (Jan. 24, 2017), https://www.themarshallproject.org/2017/01/24/what-we-can-learn-from-the-amazing-drop-in-juvenile-incarceration [https://perma.cc/GB49-7289].

¶ 142    It is well settled that "the nature, character and extent of the penalties for a particular criminal offense are matters for the legislature, which may prescribe definite terms of imprisonment, or specific amounts as fines or fix the minimum and maximum limits thereof." *People v. Smith*, 14 Ill. 2d 95, 97 (1958); see *People v. Steppan*, 105 Ill. 2d 310, 319 (1985); *People v. Taylor*, 102 Ill. 2d 201, 206 (1984) ("It is within the legislative province to define offenses and determine the penalties required to protect the interests of our society."). Courts generally defer to the legislature in the sentencing arena because the legislature, institutionally, is better equipped to gauge the seriousness of various offenses and to fashion sentences accordingly. *People v. Sharpe*, 216 Ill. 2d 481, 487 (2005); *People v. Koppa*, 184 Ill. 2d 159, 171 (1998).

¶ 143    In this spirit, I urge the legislature to consider capping *all* prison sentences at 20 years. As German Lopez observed:

"So I think the cap is a good model to aim for—a daring idea that can really reset how we, as a society, think about prison. It leads to more systemic questions: If a prison sentence for murder is now a maximum of 20 years, can

we really justify sending someone to prison for burglary or drugs for 10 or even five years? If someone is going to be released from prison eventually, shouldn't we ensure that person has support both in and out of prison so he can transition back to society safely? If prison isn't the end-all, be-all for stopping crime, should we not take other approaches more seriously?

\*\*\*

These are moral, abstract questions that I can't provide a definitive answer to. But based on the evidence and statistics, these are hurdles that we, as a society, have to think about and overcome if we want to rid ourselves of mass incarceration. The reform advocates I spoke to said that a 20-year cap is a promising way to do that—although some of them were very emphatic that some sort of exception allowing longer sentences is necessary. (Along these lines, some reformers favor a 'second look' provision that, instead of imposing a cap on sentences, merely requires a sentence reevaluation every 15 or 20 years.)

\* \* \*

If nothing else, the evidence strongly indicates that locking people up for longer isn't doing much, if anything, to keep America safer. It's time to try something new." Lopez, *supra*.

¶ 144                                    III. CONCLUSION

¶ 145        The majority errs in holding that defendant's discretionary *de facto* life sentence of 130 years' imprisonment "passes constitutional muster." *Supra* ¶ 52. To prevail on a claim based on *Miller*, *Montgomery*, and their progeny, a juvenile offender must show that "the sentencing court failed to consider youth and its attendant characteristics in imposing the sentence." *Buffer*, 2019 IL 122327, ¶ 27. In this case, the appellate court correctly held that the trial court failed to consider defendant's age and its attendant characteristics. 2018 IL App (3d) 150189, ¶¶ 27-28.

¶ 146        The majority erred as follows. First, the majority overlooked the eighth amendment presumption against life sentences for juvenile offenders. Second, the

trial court failed to apply the *Miller* factors. Third, the majority fails to apply the eighth amendment's presumption of immaturity. Fourth, the majority refuses to consider specific attendant characteristics of defendant's youth. Fifth, the majority precludes defendant from resentencing under our current juvenile sentencing scheme. Also, in light of the majority's recalcitrance in refusing to protect defendant's eighth amendment rights, I recommend that the General Assembly cap all prison sentences at 20 years.

¶ 147    For the reasons stated in the petition for rehearing and my original dissenting opinion, I respectfully dissent from the majority's denial of rehearing.