2021 IL App (1st) 18-2360-U

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

SECOND DIVISION
March 9, 2021

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | |
|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, )<br><br>Respondent-Appellee, )<br><br>v. )<br><br>DARNELL WILSON, )<br><br>Petitioner-Appellant. ) | Appeal from the Circuit Court of Cook County, Illinois, Criminal Division.<br><br>No. 03 CR 23709 02<br><br>The Honorable Kevin M. Sheehan, Judge Presiding. |

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court.
Justices Pucinski and Cobbs concurred in the judgment.

**ORDER**

¶ 1     *Held*: The trial court erred in denying the petitioner's request for leave to file his successive postconviction petition. The State concedes that the petitioner made a colorable claim of actual innocence premised on allegations that the police sergeant who led the search which resulted in the petitioner's arrest bribed the State's eyewitnesses to falsely identify him. The petitioner also made a *prima facie* showing of cause and prejudice so as to be permitted to proceed on his claim that the State violated *Brady v. Maryland*, 373 U.S. 83 (1963) when it failed to disclose evidence that the same police sergeant was the target of an ongoing investigation into allegations of extortion and corruption.

¶ 2     The petitioner, Darnell Wilson, appeals from the circuit court's denial of his *pro se*

request for leave to file a successive postconviction petition pursuant to the Post-Conviction

Hearing Act (725 ILCS 5/122-1 *et seq.* (West 2016)). On appeal, the petitioner makes three assertions. First, he argues that he sufficiently established cause and prejudice to proceed on his claim that the State violated *Brady v. Maryland*, 373 U.S. 83 (1963) when it failed to disclose evidence that former Chicago Police Sergeant Ronald Watts (hereinafter Sergeant Watts), who performed the search that led to his arrest, was the target of an ongoing investigation by the Federal Bureau of Investigation (FBI) and the Chicago Police Department's Bureau of Internal Affairs (CPD's IA division) into allegations of corruption. Second, the petitioner contends, and the State concedes, that he presented a colorable claim of actual innocence based on newly discovered evidence that Sergeant Watts offered to pay witnesses to falsely identify him. Finally, for the first time on appeal, the petitioner asserts that we should remand this matter for further proceedings under the Act to permit him to further develop a claim that his mandatory natural life sentence imposed for a crime he committed when he was only 20 years old, is unconstitutional, as applied to him. For the reasons that follow, we reverse and remand for further proceedings.

¶ 3                                    II. BACKGROUND

¶ 4     The record before us reveals the following relevant facts and procedural history. Together with five codefendants, Raymond Youngblood (hereinafter Youngblood), Ahmad Poole (hereinafter Poole), Lester Perkins (hereinafter Perkins), Derrick McNeil (hereinafter McNeil), and the petitioner's brother Donald Wilson (hereinafter Donald), the petitioner was charged with first-degree murder, attempted murder, and aggravated battery with a firearm, arising from the June 26, 2003, shooting of three victims, George Holliday (hereinafter Holliday), Leslie Coppage (hereinafter Coppage) and Melvin Jefferson (hereinafter Jefferson) at the Harold Ickes housing project (hereinafter Ickes) in Chicago. Of the three victims, only one—Jefferson—survived.

¶ 5     The petitioner was placed under arrest on June 26, 2003, after he was taken in for questioning and identified in several lineups, following a search of his mother's apartment by a team of Chicago police officers led by Sergeant Watts.

¶ 6                              A. Motion to Suppress Evidence

¶ 7     Prior to trial, the petitioner successfully challenged those identifications arguing that they were the fruits of an illegal arrest. At the hearing on his motion to suppress the lineup identifications, the petitioner's mother, Brenda Wilson (hereinafter Brenda), testified that on June 26, 2003, she lived with the petitioner at 2420 South State Street, Apartment 708, which was in Ickes. At about 2:30 or 3 p.m., Brenda was at home with her five-year old grandson, the petitioner, and the petitioner's brother Donald, when she heard banging on the door, and someone identifying as the "police." When Brenda opened the door, a police sergeant asked her whether she was the leaseholder for the apartment, and she answered in the affirmative. The sergeant then asked whether there was anyone else was in the apartment and she informed him that her grandson and two sons were there. According to Brenda, together with about five other police officer, the sergeant then entered Brenda's apartment without her permission. Brenda asked the sergeant what this was "about," but he only stated, "they sent me up here." When Brenda demanded to know who "they" were, the sergeant did not respond.

¶ 8     Brenda testified that once the police officers located the petitioner and Donald in the back room they handcuffed them and then searched the entire apartment, without asking Brenda for permission. According to Brenda, "an hour and something" after the search had been completed, Brenda was asked to sign a piece of paper, which turned out to be a consent to search form. She explained that she signed the paper without reading it because the petitioner and Donald were in handcuffs and she was scared and nervous that "[s]he was going to jail." Brenda averred that the

3

officers told her that they found marijuana in the petitioner's room, and a weapon and bullets in the hall closet. According to Brenda, after the search the police took both Donald and the petitioner away in handcuffs.

¶ 9    Sergeant Watts next testified that as he was responding to a reported shooting at Ickes, at about 2:30 p.m. on June 26, 2003, he was made aware that officers "were looking for two male blacks in the area." Once at the scene, the sergeant was met with a large crowd. As he attempted to control the crowd with about 16 other police officers, the sergeant was approached by "a male black, roughly 40 to 45 years old," who walked up to him and whispered that the individuals he was seeking were at apartment number 708 of the building complex. Sergeant Watts acknowledged that he did not recognize the man who whispered to him, and that the man did not tell him how he knew this information. The sergeant also acknowledged that he neither asked the man for his name nor any form of identification.

¶ 10    Instead, with about six officers, Sergeant Watts proceeded to apartment 708, where he knocked on the door and announced his office. When Brenda opened the door, the sergeant told her that there had been a shooting in the area and that he had information that the individuals the police were searching for had come to her apartment. The sergeant asked Brenda who else was in the apartment and she indicated that her sons were inside. Sergeant Watts testified that when he asked Brenda whether he could search her apartment, she agreed and signed a consent to search form. The sergeant, however, could not recall where that form came from. Instead, he averred that to the best of his recollection, another officer had the form on his person, or he "called someone" to bring the form to him.

¶ 11    Sergeant Watts further testified that after Brenda signed the consent form, the officers

4

searched the premises and found: (1) a weapon in the hallway; (2) some narcotics; (3) United States currency in the living room under a couch; and (4) some ammunition in different closets. According to the sergeant, the police then asked the petitioner and Donald to accompany them to the police station for questioning and they complied. Sergeant Watts testified that Donald was never handcuffed. The parties further stipulated that later that day at the police station the petitioner was identified in several lineups, after which he was placed under arrest.

¶ 12 During the motion to suppress hearing, the trial judge asked Sergeant Watts whether the man, who had whispered the location of the perpetrators in his ear, had told him "anything about the perpetrators being armed?" Sergeant Watts responded that the informant had only told him that "the people [who he was] looking for [were] at that location in [a]partment 708."

¶ 13 After hearing all the evidence, the trial court granted the petitioner's motion to suppress the lineup identifications. In doing so, the court found that Sergeant Watts was an "unreliable" witness. The court characterized the sergeant's testimony about the unknown man who had provided him with an uncorroborated tip as "problematic," explaining that this man had not said anything about who to look for, whether they were armed, or when they went to Brenda's apartment. The trial court further found that Brenda had not signed the consent to search form until after the search had already occurred, and that even if she had signed it before the search, the form was not an unlimited permission to search her apartment. According to the trial court, if anyone should have been arrested based on the consent to search form and the results of the subsequent search, it should have been Brenda, and not the petitioner or Donald.

¶ 14 After the trial court granted the petitioner's motion to suppress evidence, the State moved for an attenuation hearing for the trial court to determine whether there was an independent basis for the suppressed lineup identifications. At that hearing, the State presented

the testimony of two witnesses: (1) Eddie Jackson (hereafter Jackson), and (2) Jefferson (the sole surviving victim of the shooting). The testimony of these witnesses at the attenuation hearing was substantively identical to their subsequent trial testimony and shall be discussed further below. After the attenuation hearing, the trial court found that both witnesses "had an independent basis" for their identification of the petitioner and permitted them to testify at the petitioner's bench trial. During the petitioner's bench trial, the court also found that two additional eyewitnesses, Corey Strothers (hereinafter Strothers) and Anthony Hardy (hereinafter Hardy), had independent bases for their in-court identifications of the petitioner.

¶ 15                                    B.  Bench Trial

¶ 16        The following relevant evidence, as summarized by this court on direct appeal was presented at the petitioner's subsequent 2005 trial. See *People v. Wilson*, No. 1-06-1347 (December 8, 2008) (unpublished order pursuant to Illinois Supreme Court Rule 23) (*Wilson I*).

¶ 17        The State's theory of the case was that the shooting stemmed from a rivalry between two factions of the Gangster Disciples, those that resided at Ickes and those (like the petitioner and the codefendants) who had formerly resided at the Prairie Courts housing project (Prairie Courts) but had been relocated to Ickes after Prairie Courts was torn down. In support, the State called six eyewitnesses:  Jefferson, Jackson, Strothers, Hardy, George Lawson (hereinafter Lawson) and William Chambers (hereinafter Chambers). All six witnesses were residents of Ickes, and all but two (Strothers and Chambers) had lived there for over 10 years. Three of the eyewitnesses (Jefferson, Strothers, and Hardy) had prior or pending convictions for drug related offenses and only four (Jefferson, Jackson, Strothers, and Hardy) positively identified the petitioner as a participant in the shooting.

¶ 18        Collectively their testimony established that shortly after 1:30 p.m. on June 26, 2003,

Jefferson, Jackson, Lawson, Nathan Wilson (hereinafter Nathan), Coppage and Holliday, were at Ickes, standing outside on the front porch and steps leading up to 2240 South State Street, when Strothers approached with his two young daughters. Strothers began complaining to Coppage that one of his daughters had been hit in the eye by a rock thrown by a little boy and that he was planning to confront the child's parents. Minutes later, someone from the group stated, "Here they come," and "There go them ni***rs."

¶ 19     When Jefferson, Jackson, and Lawson looked back into the lobby of 2240 South State Street, they saw codefendants Poole, Donald, Youngblood, and McNeil inside, carrying handguns in firing position. Within seconds, multiple gunshots rang out from inside the lobby.

¶ 20     Strothers testified that he grabbed one of his daughters, spun around and threw himself over a bannister on the front porch to escape the gunfire. Strothers averred that he hurt himself when he hit the ground and that his daughter ran out of his arms whereupon he ducked down and covered to avoid the gunshots. Strothers saw Holliday grab his other little girl and move her out of the line of fire before being fatally shot and falling to the ground in front of the building.

¶ 21     Strothers averred that he heard two different sets of gunshots separated by a brief pause. The second set sounded like it came from the back of 2240 South State Street. After that second set ended, Strothers ran searching for his daughters. As he proceeded down a fire lane towards his home at 2310 South State Street, Strothers saw the petitioner from about 20 to 30 feet running in the same direction down an adjacent fire lane.

¶ 22     Strothers stated that he recognized the petitioner from previous neighborhood events at Ickes and Prairie Courts at which Strothers had performed as a disc jockey. In addition, Strothers averred that he had seen the petitioner at Ickes almost every day for the last two or three months after the petitioner had relocated there from Prairie Courts.

¶ 23    The evidence at trial further established that when the first gunshots were fired inside the lobby of 2240 South State Street, Jefferson, Jackson, Lawson, Nathan and Coppage scattered, running north toward the parking lot. Jefferson, Lawson, and Nathan made it to the parking lot where they took cover behind parked vehicles. Before Jackson and Coppage could reach cover, however, they were cut off at an angle by the petitioner, and two of his codefendants (Donald and Poole).

¶ 24    According to Jackson, Poole exited the building by a side exit and the petitioner and his brother Donald emerged from behind the same building. Jackson saw the three gunmen running and shooting at him and Coppage from about 60 feet away. Jackson averred that he was running a few feet behind Coppage, when he heard Coppage yell, "I'm hit." When Coppage fell to the ground, Jackson veered away, running towards a corner of the parking lot, where he escaped through a hole in the fence.

¶ 25    Jackson positively identified the petitioner as one of the three shooters from the parking lot. He testified that he recognized the petitioner because the two had attended the same high school and because he had seen the petitioner virtually every day for about three months when the petitioner relocated to Ickes from Prairie Courts.

¶ 26    The parties, however, stipulated that according to Chicago Police Detective Whalen's case supplemental report made during the investigation of the shooting, Jackson only told him that as he was running, he looked back and saw "four black males" shooting in the rear of 2240 South State Street but provided no other physical description of the shooters.

¶ 27    Jefferson next testified that as he was hiding in the parking lot with Lawson, he discovered that he had been shot in the leg. When he peeked around a parked car to assess the situation, Jefferson saw three men running towards him. At first, Jefferson thought the men were innocent

bystanders running from the gunshots. However, as the men approached to about 40 feet, he recognized the petitioner and two of the codefendants (Poole and Donald). As Jefferson made eye contact with the three men, they began to shoot in his direction. Jefferson averred that he and Lawson were able to escape only because they ran towards Cermak Avenue and State Street, where they flagged down a police car.

¶ 28    Jefferson positively identified the petitioner as one of the three shooters, and testified that the petitioner shot at him from a silver handgun. Jefferson explained that he recognized the petitioner from Prairie Courts where he had lived for about a year-and-a-half, prior to moving to Ickes. Jefferson also averred that prior to the shooting, he had seen the petitioner virtually every day at Ickes.

¶ 29    In contrast to Jefferson's testimony, at trial the parties stipulated that Jefferson initially identified the three shooters to the police as: Poole, Donald, and "Cheese"—an individual who was not the petitioner or any of the other codefendants.

¶ 30    Hardy, who grew up at Ickes and worked there as a janitor, next testified that he was standing outside near the back of 2320 South State Street, when he heard multiple gunshots coming from the next building over, at 2240 South State Street. Minutes later, he saw the petitioner and another man running in his direction. Hardy testified that the petitioner was carrying a handgun. As the two men ran directly past him, Hardy observed the petitioner's face for a few seconds. He claimed that the petitioner was so close to him, that he "could have reached out and grabbed him."

¶ 31    Hardy testified that he recognized the petitioner from the neighborhood. He claimed that as a

janitor at Ickes he had seen the petitioner over ten times and had become familiar with his face. Hardy also stated that before the shooting, he saw the petitioner and a group of "new residents" hanging out together in front of 2320 South State Street.

¶ 32    In contrast to Hardy's testimony the parties stipulated that if called to testify, Chicago Police Officer Kukulka would state that shortly after the shooting he spoke to Hardy who only told him that after hearing the gunshots he saw three men walking down the back lane with one carrying a big silver gun. While Hardy identified one of the three men as codefendant Youngblood, he made no reference to the petitioner.

¶ 33    Chambers next testified that when the shooting began, he was in the parking lot next to 2240 South State Street. Chambers averred that he heard multiple gunshots which appeared to be coming from the front of the building when he observed a crowd rushing towards him. Chambers ran towards Cermak Avenue but looked back and saw codefendant Poole and two other individuals running towards him. Chambers testified that as the three men approached to about five car lengths away, they started shooting at him.

¶ 34    After hearing all the evidence, the trial court found the petitioner guilty of two counts of first-degree murder and one count of aggravated battery with a firearm.

¶ 35                                C. Sentencing

¶ 36    At sentencing, defense counsel informed the trial court that if the court were permitted any discretion in sentencing, which counsel conceded the court was not, he would have brought witnesses to testify in mitigation as to why a natural life sentence was inappropriate for the petitioner, who was only 20 years old when he committed the crime.

¶ 37    In allocution, the petitioner made the following plea: "I am innocent, man I wasn't even

present when the crime took place *** These guys conspired against me because I guess they got something against me because I'm from Prairie Courts Housing Project."

¶ 38    The trial court ultimately sentenced the petitioner to a mandatory natural life sentence for the two intentional murder convictions, and six years for the aggravated battery with a firearm conviction to be served concurrently. In imposing the sentence, however, the trial court acknowledged its lack of discretion and noted that it believed that the petitioner was due more "consideration," but that unfortunately, the court had "no choice." As the court explained: "I had to determine what the evidence, who to believe and which witnesses to believe and then let the outcome flow from that. If there was a conspiracy, heaven help them. I believe the witnesses. I made the decision and that is my job."

¶ 39                                    D. Direct Appeal

¶ 40    On direct appeal, the petitioner argued that: (2) the trial court erred in finding that the State witnesses had an independent basis for their in-court identifications of him as one of the shooters; (2) the State failed to prove him guilty beyond a reasonable doubt; and (3) he was denied due process where the trial court failed to consider evidence specific to him and instead improperly found him guilty by association with the codefendants. We affirmed the petitioner's conviction on December 8, 2008. *Wilson I*, No. 1-06-1347 (unpublished order pursuant to Illinois Supreme Court Rule 23), *pet. for leave to appeal denied*, 231 Ill. 2d 686 (2009).

¶ 41                              E.  Postconviction Proceedings

¶ 42    On September 23, 2009, the petitioner filed his original *pro se* postconviction petition asserting that his trial counsel was ineffective for failing to interview and call three alibi witnesses, namely his mother (Brenda), Darrian Williams and Arthur Muldrow. In support, the petitioner attached affidavits by all three witnesses.

11

¶ 43    In his *pro se* petition, the petitioner also made an actual innocence claim in support of which he attached an affidavit by one of the State's trial witnesses, Strothers. In his affidavit, Strothers recanted his trial testimony and stated that he did not see the petitioner at the time of the shooting, but only identified him after being threatened by two of the State's other eyewitnesses, Jefferson and Jackson. Specifically, Strothers attested that Jefferson and Jackson came to his apartment with guns and told him "to make up a story" that the petitioner and his brother, Donald, "were responsible for killing their friends." According to Strothers' affidavit, Jefferson and Jackson "threatened" to harm Strothers' children if he did not comply. Strothers attested that ultimately, he "complied but only for the sake of [his] children."

¶ 44    On December 4, 2009, the trial court summarily dismissed the petitioner's *pro se* petition. We affirmed that dismissal on January 17, 2012. See *People v. Wilson*, 2012 IL App (1st) 100178-U *pet. for leave to appeal denied*, 968 N.E.2d 1072 (*Wilson II*).

¶ 45    On March 16, 2018, the petitioner filed the instant motion for leave to file his successive postconviction petition. In his proposed petition, the petitioner alleged that: (1) he was actually innocent; and (2) that the State committed a *Brady* violation when it failed to disclose that at the time of his arrest and trial, Sergeant Watts was under suspicion and investigation for corruption. The petitioner alleged that he now had newly discovered evidence that Sergeant Watts had bribed Jefferson and Jackson to convince other residents of Ickes to falsely identify him as one of the shooters.

¶ 46    In support of his proposed petition the petitioner attached, *inter alia*: (1) five affidavits, (2) a federal complaint in a whistleblower lawsuit against the City of Chicago; and (3) and three articles detailing the extent of Sergeant Watts decades-long extortion scheme in the city's

housing projects. Below, we set forth the relevant facts found in each of these supporting documents.

¶ 47    Beginning with the attached affidavits, we note that apart from his own affidavit, the petitioner attached affidavits from: (1) his mother, Brenda; (2) his sister Ruquaiyah Wilson (hereinafter Ruquaiyah); (3) Strothers; and (4) Nathan Wilson (hereinafter Nathan). [1]

¶ 48    In her affidavit, dated December 20, 2016, the petitioner's sister, Ruquaiyah, attested that since her brothers' arrest, she has been tirelessly searching the internet for information on Sergeant Watts for proof that her brothers were framed and falsely convicted for a crime they did not commit. Ruquaiyah stated that on July 4, 2016, she attended a family and friends' reunion in Dunbar Park, where she was approached by Nathan, whom she did not know. Nathan asked to speak with her "in private" about the petitioner, and then told her that his cousin had advised him to seek her out because he had no other way of contacting her brothers (Donald and the petitioner). Without going into any details, Nathan told Ruquaiyah that "he was forced to participate in giving false information about their case and wanted to clear his conscience by providing the truth." Nathan told Ruquaiyah that he no longer lived in Chicago and would "put everything he [could] remember into writing, then meet back up with [her] about 2½ weeks with the information." Ruquaiyah attested that the two of them subsequently met up in Dunbar Park on July 22, 2016, and that Nathan handed her an envelope with his affidavit, which she then mailed to her brothers.

¶ 49    In that affidavit, dated July 22, 2016, Nathan attested that in the evening after the shooting,

---

[1] We note that while Nathan and the petitioner share the same last name, in his affidavit the petitioner attested that they are not related.

13

he was walking to his apartment at Ickes when he was approached by Jefferson and Jackson, with guns drawn. Jefferson told Nathan that "[Sergeant] Watts had pulled up on him and [Jackson] in an unmarked police car moments before" and "offered to pay them a nice amount of money if they would help him close the case by saying that the guys" who had lived in Prairie Courts killed Coppage and Holliday. According to Nathan's affidavit, Jefferson stated that Sergeant Watts told them that all they needed to do was get as many people as they could to "go along" with whatever story they concocted, and the money would be theirs. Sergeant Watts further told Jefferson that the petitioner and his brother were already in police custody, so "in making up a story" they just needed to identify the petitioner, the petitioner's brother, and other men from Prairie Courts, who they had seen at Ickes on a regular basis.

¶ 50     Nathan attested that Jackson then asked him whether he was "on board." When Nathan answered in the negative, explaining that he was not about to "play games with innocent people['s] lives," Jackson blocked his path and pointed a gun at him saying " 'either roll with it or get rolled over, because we on a mission to get n***as in compliance by any means necessary.'" Jefferson also told Nathan that they already had other witnesses who had agreed to give false information against the petitioner and his brother, and that they would all go to the police station together in two days. Nathan testified that after this threat he agreed to go along with Jefferson and Jackson and gave false information against the petitioner so as not to be harmed.

¶ 51     Nathan further attested that several years ago, the petitioner reached out to him through a "mutual friend" to find out if Nathan would be willing to provide "some information pertaining to why everybody lied on them." Nathan explained that he was unwilling to help then because he still hung out with Jefferson and Jackson and his "life would have [been] in danger if they found

14

out that I helped [the petitioner] by telling the truth." Nathan attested that Jefferson and Jackson "are no longer a threat to [him] because [he has since] moved from Chicago to a place where [he] feel[s] safe."

¶ 52    In his own affidavit, dated March 5, 2018, the petitioner explained the motive behind Sergeant Watts' involvement of Jefferson and Jackson in falsely implicating him in the crime. The petitioner attested that while he lived in Prairie Courts, Sergeant Watts, and a member of his crew "jumped out of an unmarked police car on my brother Donald Wilson and myself, frisked us, and then showed us a [Z]iplock bag full of white rock like substance." Watts told Donald and the petitioner to pay up if they did not want to go to jail, and the brothers obliged giving Watts all the money in their pockets "to prevent Watts from planting drugs" on them. The petitioner averred that afterwards they "would run away from Watts every time [they] saw him in the neighborhood."

¶ 53    The petitioner further attested that about a week before the shooting, he was "hanging out" at Ickes with a few friends when Watts approached him in an unmarked car, and told him, " 'You won't be slippery forever. I will get you one of these days and it will stick.' " The petitioner ran away so as not be extorted again.

¶ 54    The petitioner stated that about a week later, on June 26, 2003, together with one uniformed police officer and 12 plain clothes officers, Sergeant Watts, entered his mother's apartment without a warrant. Sergeant Watts "rushed into" the petitioner's bedroom and handcuffed him while four of five officers searched the room. The petitioner attested that Watts pinned him "against the wall and whispered, 'didn't I tell you that you [weren't] slippery?' " Sergeant Watts took all the money of out of the petitioner's pockets ($3,525) and counted it. When the petitioner asked the sergeant why he was arresting him, Watts told him he was "going down for a

murder rap." Sergeant Watts walked the petitioner out of his room in handcuffs and sat him in a chair in the hallway. The petitioner attested that the uniformed police officer then "got in my face" and demanded a murder weapon. When the petitioner could not produce a weapon, the officer forced a bullet into his hand. The petitioner yelled that the officer had forced a bullet into his hand, and that he would not be framed. According to the petitioner's affidavit, at that point "[Sergeant] Watts called over the officer *** and whispered, 'if you f*** this up for me there will be hell to pay.' " The petitioner was then taken into custody at Watts' direction and placed in numerous lineups before his arrest.

¶ 55    The petitioner attested that he made his defense counsel aware of all this information prior to trial.

¶ 56    Aside from the affidavits, in support of his petition, the petitioner further attached four documents detailing the extent of Sergeant Watts' decades-long corruption and extortion practices at numerous Chicago housing projects.

¶ 57    The first document is a 2012 federal complaint (in case No. 12-CV-08777) by two Chicago police officers, as whistleblowers, against the City of Chicago, and the Chicago Police Department (CPD). In this complaint, among other things, the two officers alleged that in 2000 they were approached by the FBI and asked whether they had any knowledge of Sergeant Watts engaging in illegal activity, such as stealing money from drug dealers or failing to inventory evidence. The officers further alleged that after being transferred to the narcotics division in 2006, they discovered that Sergeant Watts was engaging in such illegal activities because they witnessed him robbing drug couriers and manufacturing evidence against at least one confidential informant. The officers alleged, however, that upon information and belief, the chief of CPD's IA division was aware of allegations into Sergeant Watts' misconduct long

before 2006. The officers alleged that after they approached their superiors in 2006, regarding what they had discovered, they were told in no uncertain terms not "to go there." Realizing that the CPD would do nothing, the officers approached the FBI in April 2007, after which they were recruited as informants to work on "Operation Brass Tax" investigating allegations of corruption by Sergeant Watts and other Chicago police officers. The officer's complaint further details how their investigation was curtailed at every step both by their commanding officers and the leadership of the CPD's IA division, and how they were blackballed and eventually demoted to low-level assignments within the CPD.

¶ 58    The second document attached by the petitioner, is a May 31, 2016, Chicago Tribune article about the $2 million settlement of the aforementioned whistleblower lawsuit. The article describes how the CPD's code of silence influenced the officers secret two-year undercover work with the FBI, "trying to nab the allegedly corrupt crew run by Sergeant Ronald Watts, a former public housing officer notorious for shaking down drug dealers for protection money and pinning false claims on those who wouldn't play ball," which eventually led to federal corruption charges and a federal conviction in 2013.

¶ 59    The third document is a January 14, 2014, Chicago Tribune article about the Cook County State's Attorney's Office's decision to drop charges against an unrelated defendant, Ben Baker, who alleged that he was framed in a drug case by Sergeant Watts and his crew over a decade earlier in the Ida B. Wells public housing complex, after Baker refused to pay Watts a $1,000 bribe. According to this article, the State's Attorney's decision came after Baker sought a new trial based on "dozens of pages of court and law enforcement records showing that the Chicago police internal affairs division had been aware as far back as the late 1990s of corruption allegations" involving Sergeant Watts and his crew, yet "did nothing about it."

¶ 60    The fourth document attached by the petitioner is a subsequent Chicago Sun Times article regarding the civil lawsuit filed by Baker against the city. This article notes, *inter alia*, that at the time of Baker's arrests, in 2004 and 2005, "an investigation of Watts and his crew was 'well underway' by the FBI with the knowledge of [the Chicago] Police Department's Internal Affairs" division.

¶ 61    On May 24, 2018, the trial court denied the petitioner leave to file his successive postconviction petition. The petitioner now appeals.

¶ 62                                II.  ANALYSIS

¶ 63    At the outset we note that the Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq.* (West 2016)) provides a statutory remedy to criminal defendants who claim that substantial violations of their constitutional rights occurred either at trial or at sentencing. *People v. Edwards*, 2012 IL 111711, ¶ 21. The Act is not a substitute for an appeal, but rather, a collateral attack on a final judgment. *Id.* Accordingly, issues not presented in an original or amended petition will be deemed waived, and issues that have previously been raised and addressed on appeal will be barred pursuant to the doctrine of *res judicata. Id.*; see also *People v. Sanders*, 2016 IL 118123, ¶ 24 (citing 725 ILCS 5/122-3 (West 2014)).

¶ 64    Our supreme court has repeatedly held that the Act contemplates the filing of only one petition without leave of court (725 ILCS 5/122-1(f) (West 2016)); see also *People v. Lusby*, 2020 IL 124046, ¶ 27. To obtain such leave, the petitioner must either: (1) demonstrate "cause and prejudice" for his failure to raise the claim in his initial postconviction proceedings or (2) assert a fundamental miscarriage of justice based on actual innocence. *Lusby*, 2020 IL 124046, ¶ 27; *Edwards*, 2012 IL 111711, ¶ 23.

¶ 65    In either event, leave to file a successive petition will be granted "when it is clear, from a

review of the successive petition and the documentation submitted by the petitioner, that the claims alleged by the petitioner fail as a matter of law or where the successive petition with supporting documentation is insufficient to justify further proceedings." *People v. Smith*, 2014 IL 115946, ¶ 35. At this stage, all well-pleaded allegations in the petition and the supporting affidavits that are not positively rebutted by the trial record must be taken as true. *Id.* ¶ 45. Therefore, in deciding the legal sufficiency of a postconviction petition, the court is precluded from making any factual and credibility determinations. *Id.* Our review of the trial court's denial of a motion for leave to file a successive postconviction petition is *de novo*. See *People v. Bailey*, 2017 IL 121450, ¶ 13.

¶ 66                                    A.  Actual Innocence

¶ 67        On appeal, the petitioner first contends, and the State concedes, that the trial court erred in denying him leave to file his successive postconviction petition, where the newly discovered evidence of Nathan's affidavit, as well as the newspaper articles and the federal complaint detailing Sergeant Watts' misconduct and eventual conviction on federal corruption charges, liberally construed and taken as true, set forth a "colorable claim" of his actual innocence.

¶ 68        It is axiomatic that to establish a claim of actual innocence the supporting evidence must be: (1) newly discovered; (2) not discoverable earlier through the exercise of due diligence; (3) material and not merely cumulative; and (4) of such conclusive character that it would probably change the result on retrial. *Sanders*, 2016 IL 118123, ¶ 24 (citing *Edwards,* 2012 IL 111711, ¶ 32). A request for leave to file a successive postconviction petition "should be denied only where it is clear from a review of the petition and supporting documentation that, as a matter of law, the petition cannot set forth a colorable claim of actual innocence." *Id.* In other words, leave of court should be granted where the petitioner's supporting documentation raises the probability

that it is more likely than not that no trier of fact would have convicted the petitioner in light of the new evidence. *Id.*

¶ 69    Pursuant to our supreme court's recent holding in *People v. Robinson*, 2020 IL 123849, which was decided after the petitioner filed his original appellate brief, we agree with the parties and find that it was error for the trial court to deny the petitioner leave to proceed with his actual innocence claim.

¶ 70    In *Robinson*, our supreme court clarified the standard our courts must apply in reviewing the "conclusive character" of newly discovered evidence offered in support of an actual innocence claim at the successive postconviction stage. *Id.* ¶¶ 48, 55-56. The court first reiterated that of the four elements of an actual innocence claim the "conclusive character" of the evidence is the most important. *Id.* The court then held that to meet the "conclusive character" requirement, "the new evidence supporting the petition need not be completely dispositive of [the] petitioner's innocence." *Id.* ¶ 85. The court thereby rejected prior caselaw holding that the new evidence must either totally "vindicate" or "exonerate" the petitioner. *Id.* ¶¶ 48, 55-56. Instead, the court held that "the conclusive-character element requires only that the petitioner present evidence that places the trial evidence in a different light and undermines the court's confidence in the judgment of guilt." *Id.* ¶ 56. As the court explained:

"Ultimately, the question is whether the evidence supporting the postconviction petition places the trial evidence in a different light and undermines the court's confidence in the judgment of guilt. [Citation.] The new evidence need not be entirely dispositive to be likely to alter the result on retrial. [Citation]. Probability, rather than certainty, is the key in considering whether the fact finder would reach a different result after considering the prior evidence along with the new evidence." *Id.* ¶ 48.

¶ 71     Moreover, the court held that in evaluating the "conclusive character" of newly discovered evidence at this stage, a court may not reject the new evidence solely because it conflicts with the evidence presented at the petitioner's trial. *Id.* ¶ 57. The court held that it would be "fundamentally illogical" to reject the new evidence on this basis because "[i]f the new evidence of innocence does not contradict the evidence of [the] petitioner's guilt at trial, the filing of the successive petition would be pointless." *Id.* Moreover, the court explained that "the existence of a conflict with the trial evidence" does not equate to a finding that "the new evidence is positively rebutted" by the record. *Id.*, ¶ 60. Instead, well-pleaded allegations are positively rebutted only where it is "clear from the trial record that no fact finder could ever accept the truth of that evidence, such as where it is affirmatively and incontestably demonstrated to be false or impossible." *Id.*

¶ 72     Applying the holding of *Robison* to the present case, we hold that, liberally construed, the newly discovered evidence attached to the petitioner's proposed successive petition stated a colorable claim of actual innocence, so that the petitioner should have been granted leave to proceed with this claim.

¶ 73     First, as the State itself concedes, the petitioner established that the proffered evidence was new and could not have been discovered earlier through due diligence. Specifically, in his affidavit, Nathan explained that he did not come forward earlier with information about Sergeant Watts' conscription of Jefferson and Jackson to falsely inculpate the petitioner because he was afraid that Jefferson and Jackson would harm him. Nathan further attested that he was now willing to tell the truth, only because he has since moved from Chicago and feels safe. Similarly, both the 2014 and 2016 newspaper articles and the 2012 federal complaint describing the extent of Sergeant Watts' corruption in the Chicago public housing projects were published long after

21

the petitioner's trial and therefore could not have been discovered by him earlier through due diligence.

¶ 74 Second, as the State concedes, the proposed evidence is material and noncumulative as it provides new and relevant information that directly undermines the identification testimony that implicated the petitioner in the shooting. Nathan's affidavit and the newspaper articles about Sergeant Watts' corrupt practices undermine not only Jefferson's and Jackson's credibility as eyewitnesses, but also support the petitioner's theory that Jefferson and Jackson pressured others in the neighborhood, just as they pressured Nathan, and Strothers (who has since recanted), to falsely implicate the petitioner and his brother at the behest of Sergeant Watts.

¶ 75 Finally, and most importantly, as the State concedes, the petitioner's proposed new evidence meets the "conclusive character" requirement as it suffices to "place[] the trial evidence in a different light and undermines the court's confidence in the judgment of guilt." *Robinson*, 2020 IL 123849, ¶ 48. There can be no doubt that the new evidence here raises questions about the trial court's finding of guilt, where it places the identification testimony of all four of the State's eyewitnesses (Jefferson, Jackson, Strothers and Hardy) in a different light. Where Nathan's affidavit supports Strothers' statement that he falsely identified the petitioner only because Jefferson and Jackson threatened his family and others at Ickes to falsely implicate the petitioner, there can be no doubt that the new evidence is of such conclusive character that it would probably change the result on retrial. See *People v. Woods*, 2020 IL App (1st) 163031, ¶¶ 53-54 (holding that the defendant's proposed "newly discovered evidence in the form of an affidavit" was "sufficiently conclusive to establish a colorable claim of actual innocence" where the defendant "consistently maintained that he shot in self-defense" and the proffered affidavit "corroborated this otherwise unsupported claim."); see also *People v. Willingham*, 2020 IL App

22

(1st) 162250, ¶¶ 32-35 (applying *Robinson* and *Woods* and holding that the defendant's proffered affidavit, corroborating his claim that he acted in self-defense, placed the trial evidence in a different light so that the defendant made a substantial sowing of his actual innocence that warranted an evidentiary hearing).

¶ 76    Accordingly, we hold that the trial court erred in denying the petitioner leave to proceed on his actual innocence claim.

¶ 77                                    B.  *Brady* Claim

¶ 78    On appeal, the petitioner next asserts that he sufficiently established cause and prejudice so as to be permitted to proceed on his claim that the State violated his due process rights under *Brady*, 373 U.S. at 87, when it failed to disclose evidence that Sergeant Watts was the target of an ongoing investigation into corruption, which involved "shaking down" drug dealers for protection money and "pinning false cases on those who would not pay."

¶ 79    As already noted above, to obtain leave of court to file a successive postconviction petition, not based on actual innocence, the petitioner was required to demonstrate both cause for his failure to raise the claim in the initial petition and prejudice arising from that failure.  *Lusby*, 2020 IL 124046, ¶ 27.  To show cause the petitioner had to identify an objective factor that impeded his ability to raise a specific claim during his initial postconviction proceedings.  *Id.*  To show prejudice, the petitioner had to demonstrate that the claim not raised during his initial postconviction proceedings so infected the resulting conviction or sentence that it violated due process.  *Id.*  It was the petitioner's burden to establish a *prima facie* showing of cause and prejudice before any further proceedings on his claim could occur.  *Bailey*, 2017 IL 121450, ¶ 24; *Smith*, 2014 IL 115946, ¶ 30.

¶ 80    On appeal, the State concedes that the petitioner has established the requisite cause for his

failure to raise the *Brady* claim earlier, as it is clear from the documentation attached in support of this claim (*i.e.*, the 2012 federal whistleblower complaint and the subsequent 2014 and 2016 newspaper articles) that he could not have discovered Sergeant Watts' pattern of misconduct until after he filed his initial postconviction petition on September 23, 2009, and long after his trial ended in a judgment of conviction on April 7, 2006. Nonetheless, the State asserts that even though the petitioner has established cause, he cannot establish prejudice because his *Brady* claim has no legal merit. For the following reasons, we disagree.

¶ 81 In *Brady*, the United States Supreme Court held that the State violates the accused's constitutional right to due process when it fails to disclose evidence that is favorable to the accused and material either to guilt or punishment. *Brady,* 373 U.S. at 87. According to *Brady*, the goal of the criminal justice system "is not punishment of society for misdeeds of a prosecutor but avoidance of an unfair trial to the accused. Society wins not only when the guilty are convicted but when criminal trials are fair." *Brady,* 373 U.S. at 87. Accordingly, a *Brady* violation can occur "irrespective of the good faith or bad faith of the prosecution.' " *Kyles v. Whitley,* 514 U.S. 419, 432 (1995) (quoting *Brady,* 373 U.S. at 87). Because a *Brady* duty is triggered even if the "evidence [is] 'known only to police investigators and not to the prosecutor,' " compliance with *Brady* imposes a duty on the prosecutor " 'to learn of any favorable evidence known to the others acting on the government's behalf *** including the police.' " *Strickler v. Greene,* 527 U.S. 263, 280–81 (1999) (quoting *Kyles,* 514 U.S. at 437–38); see also *Youngblood v. West Virginia*, 547 U.S. 867, 869 (2006); see also *People v. Beaman*, 229 Ill. 2d 56, 73 (2008).

¶ 82 To succeed on a *Brady* claim, a petitioner must demonstrate that: (1) the undisclosed

evidence is favorable to him because it is either exculpatory or impeaching; (2) the evidence was either willfully or inadvertently withheld by the State; and (3) withholding the evidence resulted in prejudice to him because the evidence was material to guilt or punishment. *Beaman*, 229 Ill. 2d at 73-74.

¶ 83    In the present case, the parties agree that the undisclosed evidence of Sergeant Watts' corruption is both favorable to the petitioner and material to his guilt.  Their dispute, therefore, solely centers on whether the petitioner can establish that the undisclosed evidence was either willfully or inadvertently withheld by the State.

¶ 84    In this respect, the petitioner argues that the State knew or should have known that Sergeant Watts and his subordinate officers were under suspicion of corruption at the time of his trial, and therefore either willfully or inadvertently withheld this information from him.  He points out that the newspaper articles and the federal complaint that he attached to his petition, establish that the CPD's IA division was aware of Sergeant Watts actions as early as the 1990s and certainly prior to his conviction on April 7, 2006.  The petitioner therefore argues that under *Brady* the CPD's knowledge must be imputed to the State.

¶ 85    On the other hand, the State asserts that under our supreme court's decisions in *People v. Orange,* 195 Ill. 2d 437 (2001) and *People v. Mahaffey,* 194 Ill. 2d 154 (2000), *overruled on other grounds in People v. Wrice,* 2012 IL 111860, ¶ 75, such generalized evidence of a pattern of misconduct cannot be imputed to the State, where the petitioner makes no showing that the State had knowledge of any such evidence at the time of the petitioner's trial.  For the following reasons, we disagree and find that nothing in *Orange* and *Mahaffey* prohibits the petitioner from proceeding on his *Brady* claim.

¶ 86    In *Orange* and *Mahaffey*, the defendants argued that their inculpatory statements were the

product of police coercion, and that the State violated *Brady* when it failed to disclose evidence of the pattern of torture and perjury committed by the police at Area 2 where they were questioned. Our supreme court held that because the defendants in those cases had "made no showing that the information contained within the documents" revealing the pattern and practice of misconduct at Area 2 was available to the State at the time of the defendants' trial, the State was not required to "disclose information about misconduct in unrelated cases known only to individual police officers where the nexus between the other cases of alleged abuse and the defendant's case was not known until years" later. *Orange*, 195 Ill. 2d at 458; see also *Mahaffey,* 194 Ill. 2d at 174.

¶ 87    At the outset, we note that *Orange* and *Mahaffey* are procedurally distinguishable from the facts of this case. Both decisions involved the dismissal of successive postconviction petitions "without an evidentiary hearing," so that on review the standard applied was whether the defendants presented a "substantial showing" of cause and prejudice to be permitted to proceed on their *Brady* claims. In the 20 years since *Orange* and *Mahaffey* were decided, our supreme court has made clear that the cause-and-prejudice determination must be made solely on the pleadings and that the petitioner is bound by a lesser burden of proof than the "substantial showing" requirement needed to proceed to the third stage evidentiary hearing. *Bailey*, 2017 IL 121450, ¶ 24. Instead, our supreme court has determined that a petitioner need only present *prima facie* showing of cause and prejudice. *Id.* As such, the petitioner's burden here is far lower than that applied in *Orange* and *Mahaffey*.

¶ 88    Turning to the merits, we acknowledge that by its holding in *Orange*, our supreme court ostensibly rejected the principle articulated in *Kyles* that in the context of *Brady* knowledge by the police can be imputed to the State. See *People v. Mitchell*, 2012 IL App (1st) 100907, ¶ 72

(noting the impossibility of reconciling *Orange* and *Mahaffey* with *Kyles*). Nonetheless, in contrast, nearly a decade later, in *Beaman*, 229 Ill. 2d at 74, our supreme court explicitly adopted the holding in *Kyles* in defining the parameters of *Brady*. In reviewing the dismissal of a *Brady* claim after a third-stage evidentiary hearing, in that case, our supreme court held that the *Brady* rule "encompasses evidence known to police investigators, but not to the prosecutor." *Beaman*, 229 Ill. 2d at 74 (citing *Kyles,* 514 U.S. at 438). While the *Beaman* court was not required to determine the extent to which information known only to the police can be imputed to the State because in that case the State conceded that it had withheld exculpatory evidence from the defendant, the court nonetheless clarified that under the United States Supreme Court precedent in *Kyles*, to comply with *Brady*, the prosecution "ha[d] a duty to learn of favorable evidence known to other government actors, including the police." *Beaman,* 229 Ill. 2d at 74 (citing *Kyles,* 514 U.S. at 437). In explaining the rationale behind this rule, the *Beaman* court noted " 'the special role played by the American prosecutor in the search for truth in criminal trials," and clarified that "[t]he prosecutor's interest in a criminal prosecution ' "is not that it shall win a case, but that justice shall be done." ' " (Internal citations omitted). *Beaman*, 229 Ill. 2d at 74 (quoting *Strickler,* 527 U.S. at 281 and *Berger v. United States,* 295 U.S. 78, 88 (1935)).

¶ 89     Since *Beaman* was decided after *Orange* and *Mahaffey* and explicitly adopted the rationale of *Kyles*, we follow *Beaman* and hold that the petitioner here is not foreclosed from arguing that the State either willingly or inadvertently failed to disclose evidence that Sergeant Watts engaged in a pattern of misconduct, which included "shaking down" residents of Chicago's housing projects for "protection money" and "pinning false cases on those who would not pay." The documents provided by the petitioner, liberally construed and taken as true, make a *prima facie* showing that the CPD's IA division was aware of such allegations of misconduct by Sergeant

Watts as early as the 1990s, over 15 years before the petitioner's trial, and certainly before he was convicted of murder on April 7, 2006. Under *Beaman*, such knowledge by the CPD can be imputed to the State as part of its obligation to discover favorable evidence to the accused. See *Beaman*, 229 Ill. 2d at 74; see also *Wearry v. Cain*, 136 S. Ct. 1002, 1007, n. 8 (2016); *Youngblood*, 547 U.S. 867, 869-70; *Banks v. Dretke*, 540 U.S. 668, 693 (2004); *see also Anderson v. City of Rockford*, 932 F. 3d 494, 504 (7th Cir. 2019); *People v. Jarrett*, 399 Ill. App.3d 715, 727 (2010) (citing *Beaman*, 229 Ill. 2d at 74); *U.S. v. Wilson*, 237 F.3d 827, 932 (7th Cir. 2001).

¶ 90      The State nonetheless asserts that even if knowledge by the CPD can be imputed to the State, the State is only charged with knowledge of the team directly involved in the prosecution and investigation of the case, and therefore cannot be charged with knowledge of an unrelated investigation into corruption conducted by the F.B.I. In support, the State cites to *People v Gliniewicz*, 2018 IL App (2d) 170490, ¶ 48, which held that the trial court erred in finding that "the State had knowledge of [a] consent form" in the possession of the FBI because the FBI, "is not subject to the jurisdiction of Illinois courts," and the state court lacked " 'jurisdiction to compel the FBI to produce documents subpoenaed by [the] defendant.' "

¶ 91      The State's argument is a red herring. The petitioner here asks us to impute to the State knowledge by the CPD, and not the FBI. As already noted above, the documents provided by the petitioner, liberally construed, reveal that the CPD's IA division was aware of allegations of Sergeant Watts' misconduct long before the petitioner's trial. Whether the CPD gained this knowledge from information provided by the two whistleblowers, or from the FBI is irrelevant for purposes of imputing the CPD's knowledge to the State. Moreover, any factual disputes

regarding who knew what and when should not be resolved at this pleading stage of postconviction review. *Smith*, 2014 IL 115946, ¶ 35

¶ 92    The parties further dispute whether, regardless of the CPD's knowledge of Sergeant Watts' misconduct, the sergeant's own knowledge of his misdeeds alone can be imputed to the State. In support of their respective arguments, the parties rely on decisions from other jurisdictions. The petitioner cites to the Eleventh Circuit's decision in *Arnold v. McNeil*, 622 F. Supp. 2d 1294, 1297 (MD Fla. 2009), *aff'd and adopted sub nom Arnold v. Sec'y, Dep't of Corr.*, 595 F.3d 1324 (11th Cir. 2010), which held that the State violated *Brady* when it inadvertently failed to disclose to the defense material evidence that the principal investigating officer and the key prosecution witness was committing multiple felonies while investigating that case. In imputing the detective's knowledge of his own illegal activities to the prosecutor, the Eleventh Circuit stressed that the detective was an integral part of the "prosecution team" with a key role as a prosecution witness at the defendant's trial. *Id*. at 1315.

¶ 93    The State, on the other hand, relies on the decisions of the Fourth Circuit in *United States v. Robinson*, 627 F.3d 941 (4th Cir. 2010), and the New York Court of Appeals in *People v. Garrett*, 23 N.Y. 3d 878 (N.Y., 2014), both of which held that police officers' knowledge of their own prior illegal conduct in unrelated cases could not be imputed to the prosecutors where the prosecutors had no knowledge of the officers' illegal acts until after trial. In refusing to interpret *Kyles* as imputing to the prosecution the officers' own knowledge of their misconduct, the Fourth Circuit reasoned that such a requirement would "impose unacceptable burdens on prosecutors and the police by requiring prosecutors to do full interviews and background checks on everyone who touched the case." *Robinson*, 627 F.3d at 952.

¶ 94    At the outset, we note that under the present circumstances we would be more inclined to

apply *Arnold* as it is analogous to the instant facts. In that respect, we note that contrary to the State's position we are by no means able to find that Sergeant Watts was not directly involved in the investigation and prosecution of this case. The sergeant was the officer responsible for the illegal search that resulted in the petitioner's identification and subsequent arrest and the State's sole witness at the original motion to suppress hearing. In addition, the sergeant is at the center of the petitioner's actual innocence and *Brady* claims, and is alleged to have bribed or threatened by proxy all the State's eyewitness into falsely identifying the petitioner. As such, the sergeant was integral to the investigation and prosecution of this case.

¶ 95    Nonetheless, for the following reasons, we reject the parties' invitation to determine whether a single police officer's knowledge of his or her own misdeeds can be imputed to the State, as we find that such a determination is not relevant to the resolution of this appeal. The only relevant issue here is whether the petitioner has made a *prima facie* showing that the CPD knew of Sergeant Watts' misconduct at the time of his trial, and whether that knowledge by the CPD can be imputed to the State. As already explained above, liberally construing the petitioner's pleadings and attached documentation, and applying *Beaman* and *Kyles* to the facts of this case, we find that the petitioner has met this burden and therefore may proceed with his *Brady* claim.

¶ 96                                    C. Sentencing

¶ 97    On appeal, the petitioner finally contends that we should remand this matter for further proceedings under the Act so that he may develop his claim that his mandatory natural life sentence is unconstitutional as applied to him because he was only 20 years old at the time of the offense. In support, the petitioner points out that twice recently our supreme court has acknowledged that young adults—at least those who were 20 years of age or younger at the time of their crimes—could rely on the evolving neuroscience and societal standards underlying the

rule in *Miller v. Alabama*, 567 U.S. 460 (2012) and its progeny to support as-applied constitutional challenges to life sentences. See *People v. Thompson*, 2015 IL 118151, ¶ 44; *People v. Harris*, 2018 IL 121932, ¶ 48. In addition, the petitioner relies on this appellate court's decision in *People v. House*, 2019 IL App (1st) 110508-B, ¶¶ 27-66, which held that a mandatory natural life sentence imposed on a 19-year-old petitioner violated the proportionate penalties clause of the Illinois constitution as it applied to that petitioner.

¶ 98 The State argues that this claim is waived for purposes of appeal because the petitioner did not raise it in his successive petition. The petitioner concedes that he did not raise this constitutional challenge in his motion for leave to file the instant successive petition but nonetheless asks this court to permit him to proceed forward in the interest of judicial economy. For the following reasons, we see no practical reason to deny the petitioner's request.

¶ 99 Once we reverse the trial court's denial of the petitioner's leave to file the instant successive petition that petition will be docketed for second stage proceedings, where the petitioner will be appointed counsel and counsel will be permitted to amend the pleadings in any way he or she sees fit. See 725 ILCS 5/122/5 (West 2006). Counsel will therefore have an opportunity to raise the same as-applied constitutional challenge to the petitioner's mandatory life sentence that the petitioner now seeks to raise. Requiring the petitioner to return to the trial court and file yet a third successive postconviction petition would unnecessarily waste judicial resources, encourage piecemeal litigation, and unfairly permit the State to argue down the line that the petitioner cannot establish cause and prejudice as to this same claim because he did not raise it in the instant petition. Under these circumstances and taking into account that in filing the instant petition the *pro se* petitioner was acting without the benefit of counsel, we are disinclined to find that he has waived his as-applied constitutional challenge to his mandatory natural life sentence.

See *e.g.*, *People v Johnson*, 2020 IL App (2d) 170640, ¶ 9 (holding that a juvenile petitioner did not waive his postconviction claim that the truth in sentencing statute requiring him to serve the entirety of his 27-year sentence was unconstitutional as applied to him, even though he raised it for the first time on appeal from the denial of his motion for leave to file his successive postconviction petition).

¶ 100                                      III.  CONCLUSION

¶ 101      For the aforementioned reasons we reverse the trial court's denial of the petitioner's motion for leave to file his successive postconviction petition and remand to the trial court for further proceedings under the Act.

¶ 102      Reversed and remanded.